

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-5-2006

# Toure v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 05-1746

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation
"Toure v. Atty Gen USA" (2006). *2006 Decisions.* Paper 1186.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1186

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

––––

No. 05-1746

––––

SEYDOU TOURE

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES

Respondent

––––

Petition for Review of an Order
of the Board of Immigration Appeals
(No. A97-152-778)
Immigration Judge: R.K. Malloy

––––

Submitted Under Third Circuit LAR 34.1(a)
March 9, 2006

Before:   ROTH and ALDISERT, Circuit Judges, and
RODRIGUEZ,[1] District Judge

(Filed :   April 5, 2006)

––––

[1] The Honorable Joseph H. Rodriguez, Senior District Judge, United States District Court for the District of New Jersey, sitting by designation.

Francois-Ihor Mazur, Esq.
2207 Chestnut Street
Philadelphia, PA 19103

      Counsel for Petitioner

Curtis C. Pett, Esq.
United States Department of Justice
Tax Division
P.O. Box 502
Washington, D.C. 20044

Peter D. Keisler, Esq.
Douglas E. Ginsburg, Esq.
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044

      Counsel for Respondent

**OPINION**

ALDISERT, <u>Circuit Judge</u>

Seydou Toure, a native and citizen of Cote d'Ivoire, petitions for review of a final order of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") denial of his application for asylum, withholding of removal and relief under the Convention Against Torture ("CAT"). For the reasons set forth below, we will grant the petition.

2

## I.

## A.

The current situation in Cote d'Ivoire was born from the increasingly divisive politics that arose following the death of its first president, Felix Houphouet-Boigny. Houphouet-Boigny was from the southern part of Cote d'Ivoire, which is religiously, ethnically and linguistically distinct from the North. The population of the South is predominantly Christian and animist, and is comprised of various ethnic groups, most prominently the Baoulé. French is the primary language. By contrast, the northern part of the country is predominantly Muslim in religion and Dioula and Senoufo in ethnicity. Dioula is the primary language.

In the mid-1990s, political parties from the South popularized the concept of "Ivoirianness." They seized upon the perception that northern Ivoirians have closer ethnic, cultural and linguistic ties with the countries to the North than they do with southern Cote d'Ivoire. *Rassemblement des Republicains,* or Rally of the Republicans ("RDR"), was one of several opposition parties that emerged to rally against the discrimination against northerners.

In 2000, tensions escalated when RDR's leader, Alassane Ouattara, a Dioula, was stopped from standing in the presidential elections after doubts were raised about his nationality. That decision, which was perceived as another instance of discrimination and human rights abuses against northerners, infuriated RDR supporters.

On September 19, 2002, a rebellion began against the government of President Laurent Gbagbo. A group of exiled military members, calling themselves the Patriotic Movement of Cote d'Ivoire, took control of towns in central and northern Cote d'Ivoire. According to the United States Department of State

Country Report on Human Rights Practices for 2002 ("State Department Report"), there was widespread suspicion, fostered by the government and others, that the RDR was instrumental in the coup.

Numerous human rights violations are alleged to have been committed in the suppression of the riots and rebellion. The State Department Report states that both "[s]ecurity and rebel forces committed numerous human rights abuses." (App. at 156.) A report by Human Rights Watch states that the Ivoirian government's response to the rebellion "has not been restricted to legitimate security measures, but has rather tended, at minimum, to exacerbate existing divisions in Ivoirian society and, at worst, to promote or cause human rights abuses . . .. In many cases government security forces have carried out or tolerated human rights violations by others . . . against individuals who are considered sympathetic to the rebellion simply by their ethnicity or religion." (App. at 162.) The State Department Report also observes that there have been "major divisions within the military based on ethnic, religious, and political loyalties." (App. at 165.)

B.

Against this backdrop, we turn to the specific details of Toure's application. Toure was born in northern Cote d'Ivoire in 1957 and is a Muslim of Dioula ethnicity. He joined the Ivoirian Air Force in 1976. After receiving specialized training in France in aircraft mechanics, he served as an officer in the Ivoirian Air Force as an aircraft mechanic from 1979 to October 2002. Toure is married and has five children. Prior to fleeing the country, he and his family lived in the southern city of Abidjan, the economic and administrative center of Cote d'Ivoire. His wife, Aissetou Toure, is also from northern Cote d'Ivoire. She became active in the RDR in 1999, and later became president of the Codody Section of the Rally of Republican Women, a branch of the RDR. On at least one

4

occasion, she held an RDR meeting at their home. Although Petitioner is a supporter of the RDR, he did not join because members of the Ivoirian armed forces are prohibited from engaging in political activities.

According to Toure's testimony, three distinct acts of persecution were perpetrated against him and his family.[2] First, in February 1998, after being discovered reading an opposition newspaper while at work, he spent 15 days in a military prison, after which he returned to military duties. He testified that he was not beaten and that such detentions were a common form of punishment when an officer violates a military rule.

Second, on January 9, 2001, Toure was arrested and imprisoned along with 14 other men, 12 of whom were northerners, on suspicion of abetting a failed coup d'etat. The imprisonment lasted two days, during which time he was severely beaten and sustained injuries, one of which left a scar on his forehead. During the beating, he was allegedly told something to the effect of: "You northerners, you have economic power; and not satisfied with that, your brother Ouattara wants to be president of the Republic; that never!"

The final and most serious incident occurred on either October 20 or 21, 2002, five days after Toure was accused by his superiors of giving information to the opposition press regarding the arrival by air of arms and soldiers. Toure's home was ransacked while he was attending a neighborhood security meeting. When he returned home from the meeting, he found his family's possessions thrown onto the street outside of the house, and his children were crying and his wife was nowhere

---

[2] Toure also testified that, following an RDR meeting in January 2001, the government arrested his wife and took her to prison for one night, where she was beaten. He does not emphasize this incident in his brief, but we will consider it as part of the factual background.

to be seen. When asked where their mother was, the children informed him that men with guns wearing military uniforms had taken her away.

His wife was released the next day, and appeared to have been beaten. She told him that the men had asked her about his whereabouts and accused both her and him of divulging the aviation activities of the government to the press. She also told him that they referred to her as a northerner and told her that northerners would never have political power in Cote d'Ivoire. (App. at 111-113.)

After this final incident, on October 23, 2002, Toure and his family fled their home. Toure hid in his hometown of Beoumi, while the rest of family sought refuge with Toure's sister in another part of Abidjan. While in hiding, Toure contacted a hotline that had been established by the RDR for people to report incidents involving violence by the government. Subsequently, an article was published in an opposition newspaper documenting the ransacking of Toure's home. In the article, Toure expressed fear for his life. After several weeks in hiding, Toure fled Cote d'Ivoire and came to the United States. His family remains in hiding in Cote d'Ivoire.

## C.

Toure entered the United States through New York on March 11, 2003. After being served with a notice to appear charging him with removability pursuant to 8 U.S.C. § 1227(a)(1)(B), Toure conceded removability and applied for asylum, withholding of removal and relief under CAT.

On September 18, 2003, at the close of testimony, the IJ issued an oral decision denying Toure's application for asylum, withholding of removal and relief under CAT. The IJ based her conclusion that Toure is not eligible for asylum on several findings. First, she found that the incidents described above

6

were not sufficiently severe to constitute persecution. Specifically, she found that the 1998 and 2001 detentions did not rise to the level of persecution because the 1998 detention was relatively comfortable and the 2001 detention, though harsh, was of short duration. She emphasized that Toure traveled abroad after both those events, including a 10-month sabbatical to the United States in August 2001, and that his failure to apply for asylum at that time indicated that he did not fear for his safety. With respect to the ransacking of his house, the IJ conceded that it was the "most serious offense," but she found that "it is not clear exactly what happened to his house, the respondent did not present any evidence that his house was ransacked." (App. at 66.) The IJ observed that Toure is an "educated man" and that he should have been able to obtain evidence that his house had been destroyed.

Second, the IJ found that even if Toure was persecuted, he failed to show that it was on account of statutorily-enumerated grounds. The IJ concluded that Toure could not have been targeted for his political opinion because he did not belong to a political party. Moreover, because the rebels were from all parts of Cote d'Ivoire and the rebel leader was not from Toure's tribe, the IJ found that Toure was not targeted for being either a northerner or a Dioula. Although the IJ found credible Toure's testimony that his wife was active in the RDR, she implicitly rejected this as a basis for the detentions and ransacking.

Third, at least with respect to the ransacking of the home, the IJ questioned whether the persecution was by the government or forces that the government could control. Because Toure is relatively wealthy, the IJ speculated that it may have just been an ordinary burglary: "It is possible that some individuals came to his home and ransacked his home because of the valuables contained therein, not because of any political opinion imputed to the respondent or his wife." (App. at 66-67.)

7

Fourth, the IJ found that Toure's reason for not wanting to return to Cote d'Ivoire is that he will be imprisoned and court-martialed for deserting the military. The IJ concluded that because prosecution under generally applicable laws does not constitute persecution, Toure's claim necessarily fails.

Finally, although the IJ did not make an explicit adverse credibility finding, she found it "inconceivable" that Toure would be allowed to maintain his position in the military and travel both nationally and internationally if he were suspected of being an opposition sympathizer.

The IJ then concluded that Toure's failure to prove his eligibility for asylum necessarily meant that he failed to satisfy the more onerous burdens of proving entitlement to withholding of removal or relief under CAT. The BIA affirmed the IJ's decision without opinion.

II.

We have jurisdiction over this petition under 8 U.S.C. §1252, which grants federal courts of appeals jurisdiction to review final orders of the BIA. When the BIA summarily affirms the IJ's decision, the decision we review is that of the IJ. Dia v. Ashcroft, 353 F.3d 228, 245 (3d Cir. 2003) (en banc). We review an IJ's factual findings, including his or her determination of whether an alien was subject to persecution or has a well-founded fear of future persecution, under the substantial evidence standard. See, e.g., Shardar v. Ashcroft, 382 F.3d 318, 323 (3d Cir. 2004).

Although substantial evidence review is deferential – under which we may reverse only if "'[a] reasonable adjudicator would be compelled to conclude to the contrary,'" Shardar, 382 F.3d at 323 (quoting 8 U.S.C. § 1252(b)(4)(B)) – "that deference is expressly conditioned on support in the record, and deference is not due where findings and conclusions are based on

inferences or presumptions that are not reasonably grounded in the record." Dia, 353 F.3d at 249; see also Caushi v. Att'y Gen., 436 F.3d 220, 226 (3d Cir. 2006) (same). An IJ must support her factual determinations with "specific, cogent" reasons such that her conclusions "flow in a reasoned way from the evidence of record and are [not] arbitrary and conjectural in nature." Dia, 353 F.3d at 250. Failure to do so "does not pass muster under the substantial evidence rubric." Id. at 254 (discussing Mulanga v. Ashcroft, 349 F.3d 123 (3d Cir. 2003)).

### III.

The legal precepts underlying Toure's claim are well established. The Attorney General has the discretionary power to grant asylum to an alien who qualifies as a refugee within the meaning of 8 U.S.C. § 1101(a)(42)(A). See 8 U.S.C. § 1158(b)(1). A refugee is "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" 8 U.S.C. § 1101(a)(42)(A).

To establish eligibility for asylum based on past persecution, as Toure seeks to do here, an asylum applicant must show: "(1) one or more incidents rising to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed either by the government or by forces that the government is either unable or unwilling to control." Mulanga, 349 F.3d at 132 (citing Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002)). A showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution. See 8 C.F.R. § 208.13(b)(1); Abdulrahman v. Ashcroft, 330 F.3d 587, 592 (3d Cir. 2003). "That presumption can be rebutted if the INS establishes by a preponderance of the evidence that the applicant

9

could reasonably avoid persecution by relocating to another part of his or her country or that conditions in the applicant's country have changed so as to make his or her fear no longer reasonable." Mulanga, 349 F.3d at 132 (citations omitted).

Asylum applications also constitute simultaneous applications for mandatory withholding of removal. See 8 C.F.R. § 208.3(b). To qualify for withholding of removal, an applicant must show a "clear probability" that his or her life or freedom would be threatened if he or she is deported. Lin v. INS, 238 F.3d 239, 244 (3d Cir. 2001) (citing Chang, 119 F.3d at 1066). "The question under that standard is whether it is more likely than not that the alien would be subject to persecution." INS v. Stevic, 467 U.S. 407, 424 (1984). The standard for eligibility for withholding of removal is more exacting than the asylum standard. See Chang, 119 F.3d at 1066. "Thus, if an alien fails to establish the well-founded fear of persecution required for a grant of asylum, he or she will, by definition, have failed to establish the clear probability of persecution" standard for withholding of removal. Zubeda, 333 F.3d at 469-470 (citation omitted).

To obtain relief under the Convention Against Torture, an applicant must establish "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." Sevoian v. Ashcroft, 290 F.3d 166, 175 (3d Cir. 2002) (quoting 8 C.F.R. § 208.16(c)(2)). Once an applicant establishes a claim for relief under CAT, he or she may not be removed to the country where the torture occurred or would occur. Zubeda, 333 F.3d at 472.

The burden of establishing eligibility for asylum, withholding of removal, and relief under CAT is on the applicant. 8 C.F.R. § 208.13(a).

IV.

10

With these precepts in mind, we turn to the petition for review. We will begin by analyzing whether substantial evidence supports the IJ's finding that Toure did not establish the three elements necessary to show past persecution. For the purposes of this analysis, we will assume that Toure's testimony is credible. Accordingly, if he is unable to establish those three elements, his claim fails regardless of his credibility. If he does establish those three elements, we must next examine whether the Government rebutted the presumption of a well-founded fear of future persecution that arises from a showing of past persecution. Finally, if it has not, we must review the IJ's findings that (1) Toure did not sufficiently corroborate the home invasion testimony, and (2) his testimony is implausible, which we will treat as an adverse credibility finding.

A.

To establish eligibility for asylum based on past persecution, Toure must first show that he suffered "one or more incidents rising to the level of persecution." See Mulanga, 349 F.3d at 132. In Fatin v. INS, 12 F.3d 1233 (3d Cir. 1993), we defined persecution as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." Id. at 1240. "Fatin made clear that 'persecution' denotes 'severe' conduct and that, 'persecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional. If persecution were defined that expansively, a significant percentage of the world's population would qualify for asylum in this country . . ..'" Li v. Att'y Gen., 400 F.3d 157, 167 (3d Cir. 2005) (quoting Fatin, 12 F.3d at 1240).

Because the IJ concluded that the circumstances surrounding the ransacking of Toure's home were "unclear," she explicitly addressed only the severity of the 1998 and 2001 detentions. Similarly, the Government's brief focuses almost exclusively on those two incidents, arguing that they were not

11

sufficiently severe to be considered persecution under this Court's precedents. Both the IJ's oral decision and the Government's brief emphasize that Toure traveled abroad several times following these detentions and voluntarily returned to Cote d'Ivoire, undercutting his claim that these detentions were severe enough to cause him to fear persecution in Cote d'Ivoire. See Karouni v. Gonzales, 399 F.3d 1163, 1175 (9th Cir. 2005) ("In certain cases, a petitioner's return to the country in which he or she fears persecution may undercut the petitioner's claim that his or her fear is objectively well-founded.").

Although "[t]his Court has not yet drawn a precise line concerning where a simple beating ends and persecution begins," Voci v. Gonzales, 409 F.3d 607, 615 (3d Cir. 2005), we are willing to assume, *arguendo*, that substantial evidence supports the IJ's conclusion that the 1998 and 2001 detentions, standing alone, do not constitute persecution. See Dandan v. Ashcroft, 339 F.3d 567, 573-574 (7th Cir. 2003) (holding that a single three-day detention, in which respondent was deprived of food and suffered a swollen face as a result of beatings from police, did not compel reversal of BIA's decision that respondent had not suffered persecution). This, however, does not end our inquiry. As the IJ conceded, the most egregious act of persecution was the invasion of the home and the abduction of Toure's wife. We do not agree that the facts surrounding this incident were "unclear." Toure's testimony was perfectly coherent. Moreover, this incident was not followed by any international travel and subsequent returns to Cote d'Ivoire. Indeed, this incident was the proverbial straw that broke the camel's back; it caused Toure and his family to go into hiding.

Furthermore, we do not consider the home invasion *in vacuo*; we weigh it in conjunction with the prior incidents. As Toure testified, although he felt fear as a result of the prior incidents, he returned to Cote d'Ivoire because he held out hope that the unrest would dissipate. When the harassment continued

12

and escalated, it was then that Toure fled. Unlike the frog in the parable who calmly remained in the pot of boiling water until it was too late, Toure was well aware that his environment was becoming more dangerous. We therefore do not think that Toure's return to Cote d'Ivoire and his hope for improved conditions require us to insulate these prior incidents from the ransacking and abduction.

Considering the incidents *in toto*, we conclude that, if true, they would rise to the level of persecution. In re O-Z & I-Z, 22 I. & N. Dec. 23, 26, 1998 WL 177674, 1198 BIA LEXIS 12, *6-7 (April 2, 1998) (holding that three beatings, including one resulting in a knee injury, and a home break-in, constituted persecution under the INA when considered "[i]n the aggregate"); see also Voci, 409 F.3d at 614-615 (holding that multiple beatings, one of which resulted in hospitalization, and threats against family members rose to the level of persecution). These were not "isolated incidents that [did] not result in serious injury." See Voci, 409 F.3d at 615 (collecting cases involving isolated mistreatment causing no severe injuries). The 2001 detention lasted two full days and Toure was repeatedly beaten. Then, in October 2002, his home was invaded by uniformed men, his children terrorized, his possessions destroyed and thrown into the street, and his wife abducted and beaten. These acts were not merely "unjust," "unfair" or "unlawful," Li, 400 F.3d at 167; they were overt acts of persecution.

Other than contending that the circumstances surrounding the home invasion were unclear, the Government does not dispute this conclusion. Significantly, it does not refer us to any cases where we concluded that similar acts would not constitute persecution. Its only argument is that Toure's claim of past persecution is undercut by his wife's continued presence in Cote d'Ivoire without incident. See Hakeem v. INS, 273 F.3d 812, 816 (9th Cir. 2001) ("An applicant's claim of persecution upon return is weakened, even undercut, when similarly-situated family members continue to live in the country without incident

13

. . ..”); Lie v. Ashcroft, 396 F.3d 530, 537 (3d Cir. 2005) (agreeing with Hakeem that family members' continued presence can undermine the reasonableness of a petitioner's fear of future persecution).

We initially note that this argument relates more to the issue of the reasonableness of Toure's fear of future persecution than to the question of whether he suffered past persecution. Generally, evidence of similarly-situated family members' continued presence in the country where the persecution allegedly occurred is more probative of whether the petitioner will suffer persecution if he were returned to his home country than whether he suffered persecution in the past.

In any event, we do not agree that this principle has any application where, as here, a petitioner testifies that the similarly-situated family members are *in hiding*. In such circumstances, a lack of continued persecution merely reflects the family members' ability to avoid detection, not the Government's desire, or lack thereof, to further persecute them.[3] If anything, Toure's testimony that his family remains in hiding substantiates his assertion that he was persecuted. Accordingly, we conclude that substantial evidence does not support the IJ's finding that the three incidents complained of by Toure were not sufficiently severe to constitute persecution.

B.

---

[3] Of course, if hiding means relocation to another part of the county, this may be relevant to showing that petitioner could reasonably avoid persecution by relocating within the country. See 8 C.F.R. § 208.13(b)(1)(i)(B) (stating that the Government can rebut the presumption of a well-founded fear arising from a showing of past persecution by proving that "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality"). The IJ, however, never made any finding on this issue.

14

To prevail, Toure must next show that the persecution was "'on account of' one of the statutorily-protected grounds" set forth at 8 U.S.C. § 1101(a)(42)(A).  See Mulanga, 349 F.3d at 132.  Toure contends that he was persecuted on account of his ethnicity, religion, political opinion and imputed political opinion.  The IJ found that Toure could not show that any harm he may have suffered was on account of his political opinion because he did not belong to any political party, and that he could not show that it was on account of his ethnicity because the opposition leader was not Dioula and members of the RDR come from all over the country.[4]

These findings are not supported by the facts in the record or the canons of logic.  First, there is no requirement that a petitioner be a card-carrying member of a political party to be considered persecuted on account of political opinion.  It is indisputable that individuals are able to, and do, hold political opinions even if they do not belong to a political party, and that the INA protects individuals who do not belong to a political party to the same degree as those who do.  Indeed, a person may be persecuted on account of imputed political opinion even if he or she does not actually subscribe to them.  Balasubramanrim v. INS, 143 F.3d 157, 165 n.10 (3d Cir. 1998).

The IJ's second conclusion – that Cote d'Ivoire's civil conflict is not regional or ethnic in nature – is contrary to every official account of Cote d'Ivoire's civil war, as well as Toure's testimony.  Although some southerners belong to the RDR and

---

[4]  According to the IJ: "The Court, therefore, could not find that the respondent was targeted for his political opinions because he did not belong to a political party nor was he being targeted because of the region of the country from which he hails because the rebel group consists of members of individuals [sic] from all parts of the Ivory Coast nor was he being targeted for his ethnic group because the rebel leader is a member of Senufo [sic] tribe." (App. at 64.)

15

other opposition groups, every one of these confirmed sources indicates that the conflict is primarily regional and ethnic in nature. Indeed, the conflict chiefly stems from perceived discrimination against northerners by southern political parties.

The IJ's emphasis on the Senoufo ethnicity of the RDR leader is particularly misplaced. The Senoufos and the Dioulas are the two major ethnic groups in the North, and both oppose what they perceive as discrimination against northerners. That the RDR has a Senoufo leader is therefore unsurprising, and does not rationally support the IJ's conclusion that the conflict is not ethnically or regionally based.

Nothing in Toure's testimony supports the IJ's conclusion that he was not persecuted on account of some combination of his ethnicity, religion, political opinion and imputed political opinion. Toure testified that he was initially imprisoned for reading opposition newspapers at work, indicating that the government was aware of his opposition sympathies. Further, his wife was a prominent RDR member, held an RDR meeting in their home on at least one occasion, and was arrested for RDR-related activities. It therefore seems highly probable that Toure's wife's political activities would be attributed to him.

Even more significant, the persecutors' statements clearly indicate that the persecutions were politically and ethnically motivated. During the January 2001 detention and beating, in which 13 of the 15 men detained were northerners, Toure was told something to the effect of: "You northerners, you have economic power; and not satisfied with that, your brother Ouattara wants to be president of the Republic; that never!" He was also questioned regarding his wife's political activities. Furthermore, after the home invasion, his wife told him that the men made statements about northerners and political power. In light of this testimony, there is no logical or evidentiary basis for the IJ's conclusion that Toure was not persecuted on account of

16

one of the statutorily-enumerated grounds.  See Shardar, 382 F.3d at 324 ("The evidence indicates these beatings were politically motivated – the perpetrators yelling, 'Ershad time is over.  Now is, is [sic] BNP time.'").

## C.

Third, to show eligibility for asylum based on past persecution, Toure must establish that the acts of persecution were "committed either by the government or by forces that the government is either unable or unwilling to control."  Mulanga, 349 F.3d at 132.  The IJ concluded that petitioner failed to establish the requisite governmental nexus, at least with respect to the home invasion.  She reasoned that because Toure was relatively wealthy, the October 2002 incident could have been a common burglary.

This finding is speculative and lacks support in the record.  Toure testified that his children told him that the home invasion was perpetrated by men in military uniforms with guns.  They abducted his wife, questioned her about Toure's whereabouts and made statements about "northerners."  There is simply no basis for concluding that the ransacking was perpetrated by common thieves.

The Government contends that "[a]lthough petitioner testified that he had heard that the act was perpetrated by 'people with uniform, military uniform and guns,' that does not establish that it was committed by Ivoirian soldiers . . . The State Department Report on Human Rights Practices states that criminals in the Ivory Coast perpetrate crimes while wearing fatigues and impersonating the country's security forces." (Br. at 20.)  We cannot accept the proposition that because *some* criminals pose as military personnel, the wearing of military uniforms is insufficient to prove that the home invasion was perpetrated by the Ivoirian government.  In resorting to this argument, the Government commits what logicians describe as

17

the "converse fallacy of accident." What it does is to anoint isolated incidents with the chrism of generality, and create a general rule from an exceptional circumstance. The fallacy lies in labeling the exception – "the accident" – as the general rule itself; hence the name, "converse fallacy of accident."

Moreover, even if we were to accept the Government's fallacious argument that the wearing of military uniforms is insufficient in itself to establish the requisite governmental nexus, neither the IJ nor the Government has explained why common criminals would abduct Toure's wife, ask her about his whereabouts and make comments about northerners. Accordingly, we conclude that the IJ's finding that the home invasion was not perpetrated by the government is not supported by substantial evidence.

D.

Having concluded that the IJ's finding that Toure did not establish the three Mulanga factors is not supported by substantial evidence, we now turn to whether the Government rebutted the presumption of a well-founded fear of future persecution that accompanies a showing of past persecution. The Government argues that even if Toure was subject to past persecution, his reason for not wanting to return to Cote d'Ivoire is that he will be imprisoned and court-martialed for deserting the military. The Government argues, and the IJ agreed, that desertion is a criminal act and that prosecution in conformity with generally applicable laws is not the same as persecution.

We initially observe that this argument appears to be based on an assumption that there has been a "fundamental change in circumstances," 8 C.F.R. § 208.13(b)(1)(i), and that Toure no longer reasonably fears any other form of persecution. The Government, however, did not present any evidence of changed circumstances at the hearing, and the IJ did not make any findings as to changed circumstances. Although Toure did

18

testify that he feared being court-martialed and imprisoned, he never testified that this was the only harm that he feared he would suffer if he were returned to Cote d'Ivoire. It has therefore never been established that the only risk Toure faces should he be returned to Cote d'Ivoire is the prospect of prosecution by the military, rather than persecution by the civil government.

Even if we were to assume that the only risk Toure faces upon return to Cote d'Ivoire is the prospect of lawful prosecution, the Government's argument would still fail. Although we have stated that, "[a]s a general matter . . . fear of prosecution for violations of 'fairly administered laws' does not itself qualify one as a 'refugee' or make one eligible for withholding of deportation," Shardar, 382 F.3d at 323, this rule does not apply where, as here, a petitioner must necessarily break a law to escape persecution.[5] For example, if an alien faced with ongoing persecution flees his country in violation of laws that prohibit emigration without permission, punishment for violating those laws would merely be an extension of the past persecution. It is generally no answer to say that, upon return, the alien only faces the risk of prosecution.[6] Here, Toure

---

[5] We do agree with the IJ insofar as she concluded that, absent a showing of past persecution that forced Toure to desert the military, prosecution for desertion would not qualify as persecution. See Chang v. INS, 119 F.3d 1055, 1065 (3d Cir. 1997) (holding prosecution pursuant to generally applicable laws is generally not persecution unless it targets individuals on the basis of one of the five statutorily-enumerated factors). From our examination of the record, however, Toure did not make this argument; his asylum claim is based solely on a showing of past persecution.

[6] The strongest argument, not raised by the Government here, is that if Toure is punished on his return it will be on account of criminal wrongdoing rather than on account of his political

testified that he left his position in the military because his family was in grave danger of being harmed by government authorities. See State Department Report (noting that members of the security forces committed more than 200 extrajudicial killings and reporting the existence of death squads and the discovery of mass graves). If his testimony is believed, then prosecution and imprisonment for desertion would constitute persecution under these circumstances.

## IV.

Having determined that the IJ's conclusion that Toure failed to establish past persecution is not supported by substantial evidence if Toure's testimony is believed, and that the Government has not rebutted the presumption of a well-founded fear of future persecution, we must now turn to two additional deficiencies cited by the IJ. First, the IJ complained that Toure had not produced photographs or other documentation to corroborate his testimony regarding the

---

opinion or ethnicity. We agree with the Ninth Circuit, however, that the Government's prosecution would at least be partially motivated by Toure's ethnicity and imputed political opinion. See Nuru v. Gonzales, 404 F.3d 1207, 1227-1228 (9th Cir. 2005) (holding that the mere fact that soldier in the Eritrean military, in fleeing the country in order to avoid continued persecution for his political opinions, may have committed a criminal act of desertion, for which he could lawfully be punished, did not preclude him from showing a well-founded fear of future persecution based upon his political opinion; prosecution would be motivated in part by statutorily-enumerated grounds). We find it highly improbable that Toure would be prosecuted for desertion if he actively supported the Ivoirian government and was forced by rebel forces, rather than the Ivoirian government, to flee the country. See Chang, 119 F.3d at 1065 (holding that China's motive in prosecuting defector was "at least in part 'on account of'" his political objections).

20

October 2002 home invasion. Second, the IJ appears to have made an implicit adverse credibility finding, stating that it is implausible that Toure would be permitted to maintain his government employment and to travel internationally if the government at the same time sought to harm him. As we recently made clear in Chen v. Gonzales, corroboration and credibility, although intuitively related, are distinct concepts that should be analyzed independently. 434 F.3d 212, 221 (3d Cir. 2005).

A.

Corroboration is not necessarily required to establish eligibility for asylum, and relief may be granted solely on the credible testimony of the applicant. 8 C.F.R. §§ 208.13(a), 208.16(b). In asylum and withholding of removal cases, however, the BIA has adopted rules which require corroboration in instances where it is reasonable to expect such proof from a witness and there is no satisfactory explanation for its absence. In re S-M-J-, 21 I. & N. Dec. 722, Interim Decision 3303, 1997 WL 80984 (BIA 1997). We adopted these rules as our own in Abdulai v. Ashcroft, 239 F.3d 542, 551-552 (3d Cir. 2001), and formulated a three-part inquiry: (1) an identification of facts for which it is reasonable to expect corroboration; (2) the presence or absence of such corroboration in the record; and (3) the adequacy of applicant's explanation for its absence. Id. at 554. We observed in Abdulai, without expressing agreement, that the BIA has included in this category "evidence of an applicant's place of birth, media accounts of large demonstrations, evidence of a publicly held office, or documentation of medical treatment," as well as "letters from family members remaining in the applicant's home country." See id. (citations omitted).

We have repeatedly held that the BIA's (or, as here, IJ's) failure to engage in the three-part inquiry described above requires that the BIA's findings regarding corroboration be vacated and remanded. See Abdulai, 239 F.3d at 555 ("Because the BIA's failure of explanation makes it impossible for us to review its rationale, we grant Abdulai's petition for review,

21

vacate the Board's order, and remand the matter to it for further proceedings consistent with this opinion."); Voci, 409 F.3d at 617 (vacating and remanding where the IJ merely complained that Voci had not produced documentation or medical records to corroborate his claims of having been hospitalized after being beaten by the Albanian police, and neither she nor the BIA engaged in the three-part inquiry); Mulanga, 349 F.3d at 136 (reversing and remanding where the IJ did not alert petitioner that the absence of corroboration would be fatal to the application and did not give petitioner the opportunity to explain the absence).

Against this background, we will vacate the decision and remand for further analysis.[7] The IJ did not engage in the three-

---

[7] We note that Toure did present corroboration of the home invasion in the form of an article from an opposition newspaper. The article shows a picture of items recovered from the home and quotes Toure discussing what had happened. It is unclear whether the IJ excluded this evidence or merely disregarded it. The Government objected to its introduction under 8 C.F.R. § 287.6, which requires the authentication of "official records." The IJ appears to have erroneously sustained this objection. In her oral decision, however, the IJ does mention the article, but then goes on to discount it because of a letter from the United States Embassy in Cote d'Ivoire stating that the article appeared to be from a newspaper in Boukae, which is majority RDR territory, and therefore potentially "extremely biased." After discussing the Embassy letter, the IJ never mentioned the article again. Indeed, she specifically stated that Toure "did not present any evidence that his house was ransacked." (App. at 66.) Although we agree with the Government that the article is not conclusive proof of the ransacking because it is based largely on statements by Toure, we nonetheless consider it to be an important piece of evidence. At the very least, it supports one of two conclusions: (1) that Toure's house was ransacked and he honestly believes that it was done by military forces, or (2) that Toure had the foresight to plant a fake story in a newspaper

22

part inquiry described above. Although the IJ identified the corroborative evidence that she expected and why she expected it, she never gave Toure the opportunity to provide an explanation for its absence or to seek supporting evidence from his relatives in Cote d'Ivoire. It was not until the oral decision that the IJ indicated that she expected such evidence. Accordingly, Toure was not provided with notice and an opportunity to present an explanation. See Mulanga, 349 F.3d at 136; see also Senathirajah v. INS, 157 F.3d 210, 221 (3d Cir. 1998) ("The procedures for requesting asylum and withholding of deportation are not a search for a justification to deport. Justice requires that an applicant for asylum be given a meaningful opportunity to establish his or her claim.").

We also have doubts about the reasonableness of the IJ's demand for corroboration. As we observed in Senathirajah v. INS:

> It is obvious that one who escapes persecution in his or her own land will rarely be in a position to bring documentary evidence or other kinds of corroboration to support a subsequent claim for asylum. It is equally obvious that one who flees torture at home will rarely have the foresight or means to do so in a manner that will enhance the chance of prevailing in a subsequent court battle in a foreign land. Common sense establishes that it is escape and flight, not litigation and corroboration, that is foremost in the mind of an alien who comes to these shores fleeing detention, torture and persecution.

---

before he fled to the United States. See Aguilera-Cota v. INS, 914 F.2d 1375, 1382-1383 (9th Cir. 1990) (concluding that a newspaper article reporting an alleged incident of persecution offered in support of oral testimony is sufficient documentary evidence of such an incident).

157 F.3d at 215-16.

Here, The IJ focused solely on Toure's sophistication and education without addressing the circumstances surrounding his departure. The IJ did not even acknowledge that it may be unreasonable to expect Toure to take pictures of his home in the midst of flight, or that he may have not known that he would later seek asylum and need to provide evidence. We are particularly troubled by a portion of the IJ's oral decision where she states that "[d]espite [the October 2002 home invasion] the wife continued her political activities and she held another meeting or participated in another meeting, and the police dispersed the meeting even though she had been warned not to hold additional meetings." (App. at 63.) This statement is devoid of any support in the record. The Toures fled their home and went into hiding on October 23, 2002, two or three days after the home invasion. (App. at 115.) There was no testimony that Toure's wife ever attended any meetings after the home invasion.

In light of the IJ's failure to engage in the required In re S-M-J-/Abdulai corroboration analysis, to permit Toure to explain the absence of corroborating evidence, and to accurately represent the facts surrounding the home invasion, we will vacate and remand. We acknowledge that our scope of review of corroboration determinations was recently altered by the REAL ID Act of 2005, which provides that "[no] court shall reverse a determination made by the trier of fact with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." § 101(e), Pub.L. No. 109-13, 119 Stat. 231, 305, codified at 8 U.S.C. § 1252(b)(4)(D); see also Chen, 434 F.3d at 218. This provision was effective upon passage of the REAL ID Act on May 11, 2005, and applies to any case "in which the final administrative removal order is or was issued before, on, or after such date." Id. § 101(h)(3), 119 Stat. at 305-306.

We do not believe that the REAL ID Act changes our

24

disposition of this case. We do not interpret 8 U.S.C. § 1252(b)(4)(D) to alter our rules that (1) an IJ has a duty to develop an applicant's testimony, especially regarding an issue that she may find dispositive, see In re S-M-J-, 21 I. & N. Dec. at 723-726 ("Although the burden of proof in establishing a claim is on the applicant, the Service and the Immigration Judge have a role in introducing evidence into the record."), and (2) as a logical predicate to appellate review, the BIA must adequately explain the reasons for its decisions, Abdulai, 239 F.3d at 555 ("[T]he availability of judicial review (which is specifically provided in the INA) necessarily contemplates something for us to review."). See Singh v. Ashcroft, 2006 WL 197159 at *5 (3d Cir. Jan. 26, 2006) (unpublished) (remanding for failing to explain a corroboration determination in a post-REAL ID Act case). Indeed, it is impossible for us to determine whether "a reasonable trier of fact [would be] compelled to conclude that such corroborating evidence is unavailable," 8 U.S.C. § 1252(b)(4)(D), unless a petitioner is given the opportunity to testify as to its availability.[8] Accordingly, we will vacate and remand for a new corroboration determination.

---

[8] We also note that it is doubtful that the provisions of 8 U.S.C. § 1252(b)(4)(D) even apply here. The use of the word "is" in § 1252(b)(4)(D) indicates that this provision only applies when the corroborating evidence demanded is *presently* available, not when a petitioner failed to document something in *the past*. Here, the IJ demanded photographic evidence of the ransacking. If no such pictures were taken, then photographic evidence would not be presently available because, presumably, the home has been cleaned up or passed on to new owners. Section 1252(b)(4)(D) would therefore not apply. See Hor v. Gonzales, 421 F.3d 497, 500-501 (7th Cir. 2005) (holding that the IJ's demand that Hor provide copies of documents he had filed in court in Algeria was improper because there was no reason to doubt that Hor did not possess such copies and that the court cannot presume that such copies are as readily available in disordered nations as in the United States).

## B.

Adverse credibility determinations are reviewed under the substantial evidence standard. <u>Gao</u>, 299 F.3d at 272. "We look at an adverse credibility determination to ensure that it was appropriately based on inconsistent statements, contradictory evidence, and inherently improbable testimony . . . in view of the background evidence on country conditions." <u>Dia</u>, 353 F.3d at 249 (internal citation and quotation marks omitted).

Here, the IJ did not make an explicit adverse credibility finding. She also did not find that Toure made any inconsistent statements or submitted contradictory evidence. She did, however, state that "it is inconceivable that a person who is able to maintain his employment with the military, a branch of the government, would be someone that the government wanted to harm." (App. at 64.) Moreover, she repeatedly referenced Toure's employment and his international travel for the government as a reason to doubt his testimony.

Mere doubts about the plausibility of a petitioner's testimony are an insufficient basis for denial of an application. If the BIA denies an asylum application solely because it finds the applicant not credible, it generally must clearly and explicitly state that it has made an adverse credibility finding and that it bases its denial on that finding. We have several times affirmed the rule that where an IJ or the BIA fails to make an explicit credibility finding, we will proceed as if the applicant's testimony were credible.[9] <u>See</u> <u>Lusingo v. Gonzales</u>, 420 F.3d 193, 197 n.5 (3d Cir. 2005); <u>Li</u>, 400 F.3d at 163-164;

---

[9] We note that Congress codified this rule in the REAL ID Act of 2005. The relevant provision states that "if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal." 8 U.S.C. § 1158(b)(1)(B)(iii). Because this provision applies only to asylum applications filed after May 11, 2005, it cannot apply to Toure's application.

<u>Kayembe v. Ashcroft</u>, 334 F.3d 231, 235 (3d Cir. 2003). Significantly, the Government does not contend that the IJ made an adverse credibility finding here.

Even if we were to treat the IJ's doubts regarding the plausibility of Toure's testimony as an adverse credibility finding, that conclusion would not be supported by substantial evidence. As we made clear in <u>Dia</u>, "[w]here an IJ bases an adverse credibility determination in part on 'implausibility,' as the IJ did here, such a conclusion will be properly grounded in the record only if it is made against the background of the general country conditions." <u>Id.</u> Here, there is no basis in the record for the IJ's incredulity. Indeed, contrary to the IJ's apparent assumption that the Ivoirian government is run in a top-down fashion, the State Department Report states that "[t]here were major divisions within the military based on ethnic, religious, and political loyalties." (App. at 156.) We do not agree that it is implausible that Toure could be persecuted by some government factions and nonetheless maintain his employment with the military.

Our view is reinforced by Toure's testimony that many people in the military were suspected of supporting the RDR. For example, 14 other men from the military were detained, interrogated and beaten in the January 2001 incident. Cote d'Ivoire would not be the first country to hunt through its ranks for subversives without actually firing every person it suspected. That the government chose not to fire every suspected dissident is especially understandable when those suspected, like Toure, are integral employees and do not regularly work with classified information. (<u>See</u> Toure testimony, app. at 57 (explaining that he believes he was not fired because he was one of only 10 specialists and because the government had no actual proof that he belonged to the opposition party).) Moreover, it is unknown whether Toure would have maintained his position after the October 2002 home invasion. This was the most severe act of persecution, indicating either that the government was relatively certain that Toure was actively supporting the opposition or that it was reducing its tolerance for those even suspected of having

RDR ties.

In sum, the record is barren of support for the IJ's conclusion that Toure's testimony is implausible. Assuming that the IJ made an adverse credibility finding – and this is only an assumption – such a factual conclusion would be based on nothing more than speculation and conjecture. Accordingly, we will vacate this finding.

V.

The IJ here found fault in virtually every aspect of Toure's application. Upon review of the record, we conclude that none of the IJ's findings adverse to Toure are supported by substantial evidence. An IJ must do more than simply list off all the doubts he or she may have about a petitioner's application in the belief that at least one of them will be sufficient to support the decision. Although an IJ may support his or her decision with alternate findings, and is in many cases encouraged to do so, at least one of the findings must be sufficiently well-developed and grounded in the record to sustain the decision. Here, the IJ made six findings that could be considered dispositive of Toure's application. Some are simply speculative or insufficiently developed; others defy the canons of logic. See Dia, 353 F.3d at 250 ("[W]e find that the IJ's conclusions do not flow in a reasoned way from the evidence of record and are, at times, arbitrary and conjectural in nature. Repeatedly, we are left wondering how the IJ reached the conclusions she has drawn.").

* * *

For the reasons detailed above, we will grant the petition for review, vacate the BIA's decision and remand for further proceedings consistent with this opinion.[10]

_____

[10] Because many of the same errors infected the IJ's determination that Toure did not qualify for withholding of

28

removal or protection under CAT, we will also vacate and remand with respect to those claims.