NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 17-2313

_____

LAURETA NDOU,

Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,

Respondent

_____

On Petition for Review of a Final Order
of the Board of Immigration Appeals
Immigration Judge:  Honorable Mirlande Tadal
(No. A208-936-858)

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
July 20, 2018

Before: AMBRO, RESTREPO, and FUENTES, <u>Circuit Judges</u>

(Opinion filed: December 28, 2018)

_____

OPINION[*]

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

_____

AMBRO, *Circuit Judge*

In *Toure v. Attorney General*, 443 F.3d 310 (3d Cir. 2006), and *Chukwu v. Attorney General*, 484 F.3d 185 (3d Cir. 2007), we considered a provision of the Immigration and Nationality Act ("INA"), 18 U.S.C. § 1252(b)(4), addressing what an immigration judge ("IJ") needs to do to develop record evidence once she determines that an applicant's story requires corroboration. We held that the "IJ must give the applicant notice of what corroboration will be expected and an opportunity to present an explanation if the applicant cannot produce such corroboration." *Chukwu*, 484 F.3d at 192. The Board of Immigration Appeals (the "BIA") subsequently determined that notice is not required under a provision of the INA, 8 U.S.C. § 1158(b)(1)(B)(ii), that was not applicable at the time *Toure* and *Chukwu* were decided. *Matter of L-A-C-*, 26 I. & N. Dec. 516, 523-24, 2015 WL 4386337 *6 (BIA Mar. 19, 2015) ("Applicants have the burden to establish their claim without prompting from the Immigration Judge."). Our Court, however, recently confirmed that IJs in our Circuit must continue to follow *Chukwu*'s notice-and-opportunity-to-respond requirements despite the BIA's contrary decision. *Saravia v. Att'y Gen.*, 905 F.3d 729 (3d Cir. 2018). While normally we would vacate and remand, the context of our case counsels otherwise.

I.      Facts

Laureta Ndou, a native and citizen of Albania, arrived in the United States at JFK International Airport and presented a stolen U.S. passport in the name of Jennifer Rani Brogan. At her airport interview Ndou stated she was "afraid" to return to Albania

2

because "[t]he loneliness is bad. I am lonely every day at home. There is no school. There is nothing else." If the United States returned her there, she alleged, she would be harmed. Ndou did not mention political opinion as a reason for her fear. The Department of Homeland Security charged her with removability for fraud and failure to present a valid visa or entry document under 8 U.S.C. § 1182(a)(6)(C)(i) and 8 U.S.C. § 1182(a)(7)(A)(i)(I). She conceded removability under both charges.

Before the Immigration Judge, Ndou, with counsel, sought asylum under 8 U.S.C. § 1158, withholding of removal under 8 U.S.C. § 1231(b)(3), and relief under Article III of the Convention Against Torture, based on her membership in the Democratic Party of Albania. She claimed that the government of Albania was persecuting her and her family because of their political views and activities. She testified that at certain times her grandfather was "not allowed to do anything or celebrate anything" and that her uncle, a priest, was jailed. She said her father in 1991 was responsible for guarding the election box during Albania's first election. That day, she claims, members of the Socialist Party of Albania stole the box and Ndou's mother was beaten unconscious. Later, in 1997 and 2000, two of her uncles fled to the United States to avoid persecution. The first received admission through the immigration lottery system, and the other, who faced "threats, beatings and arrests," was granted asylum.

According to Ndou, she joined the Democratic Party herself in 2009 when she became involved with its Youth Forum, and she assisted with the Party's election efforts during the 2013 election, which was won by the Socialist Party. About this time, she testified, members of the Socialist Party threw glass bottles at her and her brother. She

3

also recounted an incident in which a group of young Socialist Party supporters threatened her with vulgar language as she was riding a bus home from Democratic Party-related activity. The youths grabbed her by the arm, told her not to support the Democratic Party, then left the bus and went into a black SUV with tinted windows. She returned home so stressed that her parents called a doctor.

Ndou also claims she was later detained for several hours by the Secret Police, who questioned her about her political activities, told her to stop supporting the Democratic Party, and warned her that her "father could no longer protect [her]." They "[g]rab[bed] me by my arm, my hair. They squeezed me." Ndou alleged also that she "was mentally tortured." She reported the incident to police, who did nothing, telling her that her "party was now the opposition and our job is to make your life miserable." After considering her predicament, Ndou left Albania for the United States. She asserts that, if we return her to Albania, "everything bad" may happen and the government "may put me in jail."

To support her application for relief from removal, Ndou supplied the Democratic Party's written "confirmation" that she was a member of the Youth Forum in 2009, that she "was very active in all the campaigns that occurred at the time," and that she "was noticed by political opponents." Her uncle, it related, was one of the Party's founders and "stood shoulder to shoulder" with the activists who "toppled Communism" in his village.

Ndou also provided a declaration from her father, Zef Ndou, corroborating her account of the family's longstanding involvement in the Democratic Party and

4

persecution by the Socialist Party. He explained that his daughter had supported the Party since 2001 and that she was involved with establishing programs and recruiting new members. Mr. Ndou claimed that, because the family's village is known for its support of the Socialist Party, it is "especially dangerous" for his daughter to support the Democratic Party. He also corroborated her descriptions of the incidents involving the thrown glass bottles, threats on the bus, and detention by the Secret Police. He concluded that it "is not safe for her to return, and she will be in danger if she does return."

Ndou also provided an expert's report from Professor Bernd J. Fischer, who holds a doctorate in Balkan history with an Albanian specialty. Based on his review of Ndou's application and statement, Professor Fischer reported that her description of events was consistent with Albanian conditions generally and that he believed there is a reasonable possibility the Socialist Party will persecute her if she returns. He had neither first-hand knowledge of the events nor did he interview Ndou.

At the hearing, the Government's counsel pressed Ndou on the failure to corroborate certain of her claims. He asked why she had no medical records, police reports, news articles featuring her family as prominent members of the Democratic Party, nor statements from witnesses, such as her brother (who was with her when the glass bottles were thrown) and those who were on the bus when she was attacked. Ndou responded to these questions by agreeing that she had nothing more to corroborate the items pressed by counsel. Neither she nor her counsel requested a further opportunity to provide corroboration. The IJ took no part in this colloquy, did not identify any items

5

needing corroboration, and afforded no opportunity to explain why corroborating evidence may have been unavailable.

The IJ denied Ndou's application for asylum, withholding of removal, and relief under the Convention Against Torture. She began by finding that Ndou's testimony was unpersuasive for several reasons. First, as noted, Ndou lied when asked whether she had ever applied for a visa. At the airport interview, she stated she had applied twice and was denied entry both times. During the hearing, she repeatedly denied applying. Then, when confronted with her airport testimony, Ndou stated that her uncle had sent her an "affidavit" to come to the U.S. After finally admitting she had applied, Ndou stated her denial of the fact had been a "mistake." Second, Ndou lied by presenting a false passport at customs. Third, she gave conflicting reasons for her desire to come to the U.S. At the airport she had cited loneliness, not persecution as a Democratic Party member. Fourth, Ndou did not convince the IJ that she was an active member of the Democratic Party because her "vague and unpersuasive" testimony suggested she had "only a rudimentary knowledge of the party's goals and objectives." Nonetheless the IJ did not "find that there are sufficient factors present to render an adverse credibility finding."

The IJ also found Ndou "failed to corroborate her assertion that she was mistreated in Albania due to her political opinion." Given the importance to Ndou's claim, "it is reasonable to expect [her] to produce corroboration of these events." Moreover, as to the corroborating evidence Ndou did provide, the IJ first accorded the declaration of Ndou's father "less weight" because he did not appear in person for cross-examination and because, as a father, he "has the incentive to lie in support of his daughter's claim."

6

Second, the IJ discounted Professor Fischer's report, as he did not speak with Ndou and had no independent knowledge of the incidents. Thus "[h]is report does nothing to corroborate [Ndou's] specific claims of mistreatment." The IJ further noted that Ndou "has not adequately explained her failure to provide corroboration."

About Ndou's asylum claim, the IJ concluded that none of the events described by Ndou were so imminent, menacing, or harmful as to constitute persecution. Further, the IJ found that Ndou had not shown a well-founded fear of future persecution, as it appeared she was minimally involved with the Democratic Party, while her father, an active member of the Party, has lived in peace in Albania since 1991. Given the failure to establish an asylum claim, the IJ concluded that Ndou could not have met the higher standard of proof required for withholding of removal. For the claim under the Convention Against Torture, the IJ determined that Ndou had not shown it was more likely than not she would suffer torture, which is defined as intentionally inflicting severe pain and suffering. *See* 8 C.F.R. § 1208.18(a)(1).

Ndou appealed the denial of all three forms of relief. The BIA agreed with the IJ that the incidents Ndou described did not constitute persecution and that she did not show a well-founded fear of persecution or a likelihood of serious harm or torture. In a footnote at the end of its decision, the BIA rejected Ndou's argument that the IJ incorrectly found Ndou needed to submit corroborating evidence, as it was reasonable to give lesser weight to her father's statement because he was not available for cross-examination and to Dr. Fischer's report because he did not interview Ndou.

7

Ndou petitions us primarily to assert that the IJ failed to follow *Chukwu*'s requirement to notify her of the need for corroborating evidence and to allow her the opportunity to explain why she was unable to provide it. She claims secondarily that there is insufficient evidence to support the IJ's adverse factual findings. We disagree as to the latter and thus focus on the first issue.

## II.    Jurisdiction and Standard of Review

We have jurisdiction to review a final order of the BIA dismissing an appeal of an IJ's decision to deny an alien's asylum application. 8 U.S.C. § 1252(a)(1). Our review is limited to the reasons provided by the BIA. *Orabi v. Att'y Gen.*, 738 F.3d 535, 539 (3d Cir. 2014). However, where it "adopts the findings of the IJ and discusses some of the bases for the IJ's decision, we have authority to review the decisions of both the IJ and the BIA." *Chen v. Ashcroft*, 376 F.3d 215, 222 (3d Cir. 2004). "[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B)). Our review of constitutional issues and questions of law is *de novo*. *Chen*, 376 F.3d at 222.

## III.    Discussion

An alien who seeks asylum or related relief carries the burden of proving that she is a refugee. 8 U.S.C. § 1158(b)(1)(B)(i); *id.* § 1231(b)(3)(c); 8 C.F.R. 208.16(c)(2). But we recognize the obvious: putting on a full-dress trial of her evidence may be near impossible, as persons fleeing persecution are often not able to gather the relevant evidence on the way out of their country, much of it likely being in the hands of their persecutors. "Common sense establishes that it is escape and flight, not litigation and

8

corroboration, that [are] foremost in the mind of an alien who comes to these shores fleeing detention, torture and persecution." *Senathirajah v. I.N.S.*, 157 F.3d 210, 216 (3d Cir. 1998). Hence we have held that in certain circumstances a refugee need only "prove his persecution claim with his own testimony if it is credible." *Id.* (quoting *Mosa v. Rogers,* 89 F.3d 601, 604 (9th Cir. 1996)); *see also* 8 C.F.R. § 208.13.

The INA sets out when an asylum applicant may sustain a burden of proof with her own testimony and when corroborating evidence is needed:

> The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee. In determining whether the applicant has met the applicant's burden, the trier of fact may weigh the credible testimony along with other evidence of record. *Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence.*

8 U.S.C. § 1158(b)(1)(B)(ii)(emphasis added).

Per the statute, the applicant's evidentiary burden depends on the credibility of her testimony. Where, as here, "no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal." *Id.* § 1158(b)(1)(B)(iii).[1] The BIA left undisturbed the IJ's decision not to make an adverse credibility finding for Ndou. Accordingly, we treat her testimony as credible for purposes of ruling on her petition for review.

---

[1] The "appeal" referred to by the statute is the applicant's appeal to the BIA; the applicant "petitions" our Court. *See Ming Dai v. Sessions*, 884 F.3d 858, 868-69 (9th Cir. 2018).

As a result, Ndou's testimony may have carried the day if the IJ had also found it "persuasive . . . and refers to specific facts sufficient to demonstrate that [she] is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii). Instead, the IJ concluded the testimony was "unpersuasive," that Ndou "failed to corroborate her assertion she was mistreated in Albania due to her political opinion," that it was reasonable to expect corroborating evidence given the importance of the events to Ndou's claim, that she did not do so, and that she did not adequately explain why. Yet the IJ at the hearing neither identified nor asked Ndou about the availability of corroborating evidence, and did not seek her explanation for the failure to supply it.

To assure a sufficiently rigorous review in our Circuit, *Abdulai v. Ashcroft*, 239 F.3d 542, 554 (3d Cir. 2001), requires IJs to complete three steps before concluding that an applicant did not meet her burden for corroboration: (1) identify relevant facts for which it is reasonable to expect the applicant to produce corroborating evidence; (2) examine whether the applicant corroborated those facts; and (3) analyze whether she explained any failure to provide corroborating evidence.

The Real ID Act of 2005 changed the scope of our review by adding to the INA a provision directing that "[n]o court shall reverse a determination made by the trier of fact with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4)(D). We rejected nonetheless the argument that it altered our rule about the IJ's duty to develop the record on corroboration, as "it is impossible for us to determine whether a reasonable trier of fact

10

[would be] compelled to conclude that such corroborating evidence is unavailable . . .

unless a petitioner is given the opportunity to testify as to its availability." *Toure*, 443

F.3d at 325 (citing § 1252(b)(4)(D)); *accord Chukwu*, 484 F.3d at 192 ("[T]he REAL ID

Act does not change our rules regarding the IJ's duty to develop the applicant's

testimony, and in particular, to develop it in accord with the *Abdulai* steps."); *see also*

*Quao Lin Dong v. Att'y Gen.*, 638 F.3d 223, 229-32 (3d Cir. 2011); *Sandie v. Att'y Gen.*,

562 F.3d 246, 252-53 (3d Cir. 2009). Otherwise, the IJ has not carried out her "duty to

develop an applicant's testimony, especially regarding an issue that she may find

dispositive." *Toure* 443 F.3d at 325. Moreover, such a colloquy is a "logical predicate to

appellate review," *id.*, that allows us, among other things, to determine if the IJ's

assumptions as to the availability of corroboration are realistic. *See* Alexandra Lane

Reed, Note, *Reconciling Expectations with Reality: The REAL ID Act's Corroboration*

*Exception for Otherwise Credible Asylum Applicants*, 115 Mich. L. Rev. 553, 578-80

(2017).

Subsection 1252(b)(4)(D)'s limitation to our review became effective when passed

on May 11, 2005, and applied to any case "in which the final administrative removal

order is or was issued before, on, or after such date." 8 U.S.C. § 101(h)(3). However,

subsection 1158(b)(1)(B)(ii), covering an applicant's burden of proof, applies only to

asylum applications made after the effective date of the Real ID Act. All of the cases

from our Circuit cited above had asylum applications that predated the Act; thus

§ 1158(b)(1)(B)(ii) did not apply. It does apply to Ndou's case, as her application was

11

made in 2013.  Would those earlier panels have decided Ndou's case differently than in *Toure*, *Chukwu*, *et al.*?

The Government contends that we must give deference, per *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), to the BIA's interpretation of § 1158(b)(1)(B)(ii) because the statute is ambiguous as to whether an IJ must stop and prompt the applicant to discuss the corroborating evidence needed to meet her burden of proof.  It argues that the BIA's interpretation of the now-available provision is a reasonable, hence permissible, construction of the statute.  But *Saravia* tells us that interpretation is not reasonable:

> As noted, the last sentence in § 1158(b)(1)(B)(ii) states that "[w]here the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain [it]."  Whether we construe under § 1252(b)(4)(D) or § 1158(b)(1)(B)(ii), we cannot conclude on review that it was fair to require Saravia to provide further corroboration without telling him so and giving him the opportunity either to supply that evidence or to explain why it was not available.  Under any other rule, our review is not meaningful.
>
> That opportunity to supply evidence or explain why it is not available can only occur before the Immigration Judge rules on the applicant's petition.  To decide otherwise is illogical temporally and would allow for "gotcha" conclusions in Immigration Judge opinions.

905 F.3d at 737-38.

The expected result would be, as noted at the outset, an opinion that would vacate and remand per *Saravia*.  But, as a practical matter, Ndou conceded on questioning by the Government's counsel at her hearing that she had no further evidence to corroborate her

12

story.[2]  Thus any omissions by the IJ to indicate what corroboration she expected and the opportunity to explain why it was unavailable would not give any hope to someone, like Ndou, who admitted there was nothing more to back up her story.  In this context, any error was harmless.  Thus we believe there is no practical alternative but to deny the petition for review.

---

[2] To repeat, there were no medical records, police reports, relevant news articles or further statements from witnesses.  And there was no request for more time to attempt to gather such evidence.