

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-29-2005

# Chen v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-4887

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Chen v. Atty Gen USA" (2005). *2005 Decisions.* Paper 4.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/4

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

No. 03-4887

---

XIA YUE CHEN,

Petitioner

v.

ALBERTO R. GONZALES, ATTORNEY GENERAL OF THE UNITED STATES

Respondent

---

On Petition for Review from the Board of Immigration Appeals
Agency No. A78-746-838

---

Submitted Under Third Circuit LAR 34.1(a): January 13, 2005

Before: SCIRICA,[*] *Chief Circuit Judge*, ROTH, *Circuit Judge,* and IRENAS,[**] *Senior District Judge.*

(Filed December 29, 2005)

Norman K.W. Wong, Esquire
401 Broadway, Suite 1205
New York, NY 10013

Counsel for Petitioner

Peter D. Keisler
Assistant Attorney General
Civil Division

Margaret J. Perry
Senior Litigation Counsel

Mary Jane Candaux
Douglas E. Ginsburg
Jennifer L. Lightbody
John D. Williams

---

[*] This case was originally submitted to the three judge panel of Roth, Chertoff and Irenas. Judge Chertoff subsequently resigned and Chief Judge Scirica was designated as the third member of the panel.

[**] Honorable Joseph E. Irenas, Senior United States District Judge for the District of New Jersey, sitting by designation.

United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

Counsel for Respondent

OPINION OF THE COURT

IRENAS, *Senior United States District Judge.*

Petitioner Yue Xia Chen ("Chen") petitions for review of the decision of the Board of Immigration Appeals ("BIA") denying her application for asylum, withholding of removal, and protection under the Convention Against Torture. The focus of Chen's argument is that she was subject to a forced abortion which made her eligible for refugee status in this country. The principal issue on this Petition for Review is whether the Immigration Judge ("IJ") properly determined that her testimony on this issue lacked credibility and was insufficiently corroborated. Although we find that the IJ did not make the separate credibility finding required by In re S-M -J-, 21 I. & N. Dec. 722, Interim Decision 3303 (BIA 1997), 1997 WL 80984, his decision to deny the Petition for Review based on a determination that Chen did not meet her burden of proof by adequately corroborating her story was a proper application of the principles set forth in Abdulai v. Ashcroft, 239 F.3d 542,

554 (3d Cir. 2001).

I.

Chen, a citizen of the People's Republic of China, entered the United States at St. John in the United States Virgin Islands without inspection on or about October 20, 2001. The INS issued a Notice to Appear, alleging that Chen was inadmissible because she was present in the United States without being admitted or paroled, in violation of 8 U.S.C. § 1182(a)(6)(A)(i). Such a person is removable under 8 U.S.C. § 1227(a)(1). Chen conceded her removability, but filed an application for asylum under 8 U.S.C. § 1158 and withholding of removal under 8 U.S.C. § 1231(b)(3), and sought protection under the Convention Against Torture.[1] Following a hearing, an Immigration Judge ("IJ") denied her application on October 1, 2002. Chen appealed the IJ's decision to the BIA, which affirmed the IJ's decision without opinion on December 16, 2003. This Petition for Review followed.

II.

To qualify for asylum, Chen must demonstrate that she meets the statutory definition of "refugee" under the

---

[1]United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, G.A. Res 39/46, U.N. GAOR, 39th Sess., Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984).

Immigration and Nationality Act, which states generally that a refugee is:

> [A]ny person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. § 1101(a)(42). This definition has been amended to specifically address Congress' concern with coercive family planning practices, by providing, *inter alia*, that anyone who has been "forced to abort a pregnancy . . . shall be deemed to have been persecuted on account of political opinion." Id.

Withholding of removal does not rely on the perspective of the applicant's well founded fear, but is instead appropriate only if the Attorney General determines that there is a "clear probability" that the alien's life or freedom would be threatened upon her removal to a particular country. INS v. Stevic, 467 U.S. 407, 412 (1984); see also 8 U.S.C. § 1231(b)(3)(A).

The Convention Against Torture has been implemented by regulations codified at 8 C.F.R. §§ 208.16 and 208.18 which require withholding of removal for an alien who can show that it is more likely than not that she will be tortured by the government or with its acquiescence upon removal to a particular country. The regulations define torture as "an extreme form of cruel and inhuman treatment," but not "lesser forms of

cruel, inhuman or degrading treatment or punishment not constituting torture." 8 C.F.R. § 208.18; see also 8 U.S.C. § 1231 note (1998) (United States Policy With Respect to the Involuntary Return of Persons in Danger of Subjection to Torture).

III.

Where, as here, the BIA affirms the IJ's decision without opinion, "we review the IJ's opinion and scrutinize its reasoning." Dia v. Ashcroft, 353 F.3d 228, 245 (3d Cir. 2003) (en banc). Review of an IJ decision is conducted under the substantial evidence standard which requires that administrative findings of fact be upheld "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); Zheng v. Gonzales, 417 F.3d 379, 381 (3d Cir. 2005). "Adverse credibility determinations are factual findings subject to substantial evidence review." Id.; Tarrawally v. Ashcroft, 338 F.3d 180, 184 (3d Cir. 2003). We will defer to and uphold the IJ's adverse credibility determinations if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole," INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992), but such findings must be based on inconsistencies and improbabilities that "go to the heart of the asylum claim." Id.; see also Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002).[2] "[D]eference is not due where findings and

[2] The REAL ID Act of 2005 was adopted on May 11, 2005. Pub. L. No 109-13, 119 Stat. 231 et seq. This law created new standards to guide a finder of fact in making credibility

conclusions are based on inferences or presumptions that are not reasonably grounded in the record as a whole." Balasubramanrim v. INS, 143 F.3d 157, 161 (3d Cir. 1998).

IV.

A.

We begin with Chen's asylum claim. At the hearing before the IJ Chen testified[3] that she was born on January 1, 1980, in a village in Fujian Province. In 1999 she began working as a salesperson in a store associated with a privately owned jewelry factory. Chen became romantically involved with a young man who worked at the factory. Both of them lived for some time in a dormitory provided for the company's workers. Toward the end of February, 2000, Chen suspected she was pregnant and told her boyfriend. On March 1, 2000, they went to a private doctor recommended by a manager at the factory. This doctor confirmed that she was approximately one month pregnant, although the record does not include the name

---

determinations in proceedings involving removal of aliens. See REAL ID Act of 2005, § 101(a)(3), (c), and (d), 119 Stat. at 303-304. These three amendments will be codified at 8 U.S.C. § 1158(b)(1)(B)(iii), § 1231(b)(3)(C), and § 1229a(c)(4)(C), respectively. However, these new standards apply only "to applications for asylum, withholding, or other relief from removal" made after the effective date of the Real ID Act. See id. at § 101(h)(2), 119 Stat. at 305.

[3]Chen's testimony was given in a Chinese dialect referred to as "Foo Chow" and translated by an official interpreter.

of the doctor, an affidavit from the doctor, or any medical records maintained by the doctor.

According to Chen's testimony, Chinese law permits 20 year-old women to marry. However, she could not marry her boyfriend because he was not yet 22 years of age, the minimum legal age of consent for a man. A few days after her visit to the doctor she went to live with her paternal aunt to "hide," having obtained a three-month leave of absence from her employer on the pretext of needing to care for her grandfather. This decision was based on her belief that Chinese officials would not allow her to have the baby.

Chen testified that on April 20, 2000, four "village cadres"[4] came to her aunt's house, where Chen was hiding to conceal her pregnancy, and told her that they had learned from the neighbors that she was pregnant. How these neighbors or the cadres learned of her pregnancy is not explained. She was obviously trying to keep it a secret, and it does not appear that her pregnancy was yet visible. Indeed, she denied being pregnant but was told by the cadres that she still needed to go with them and submit to a physical examination. Chen testified that she was taken to the hospital where she was forced to undergo an abortion. She stated that while at the hospital she

---

[4]Neither Chen's testimony nor the father's letter make the meaning of "village cadre" clear. The term "cadre" may be used by asylum applicants because of its perceived negative connotation. It appears in numerous opinions. See, e.g., Wang v. United States, 423 F.3d 260, 262 (3d Cir. 2005); Zheng v. Gonzales, 417 F.3d 379, 382 (3d Cir. 2005); Chen v. Ashcroft, 376 F.3d 215, 218 (3d Cir. 2005).

begged the cadres to let her go home and actually resisted them. At that point, two of the cadres held her hands and a third cadre repeatedly slapped her and called her a "shameless woman from my village." (AR 59.) Chen stated that she lost her will to resist and collapsed, at which point two doctors dragged her into an operating room and performed the abortion.

B.

Corroboration is not necessarily required to establish a petitioner's right to asylum, and relief may be granted solely on the credible testimony of the applicant. 8 C.F.R. § § 208.13(a), 208.16(b). In asylum and withholding of removal cases, however, the BIA has adopted rules which require corroboration in instances where it is reasonable to expect such proof from a witness and there is no satisfactory explanation for its absence. In re S-M-J-, 21 I. & N. Dec. 722, Interim Decision 3303 (BIA 1997), 1997 WL 80984. These rules were sustained in Abdulai v. Ashcroft, 239 F.3d 542, 551-552 (3d Cir. 2001), in which the Court observed that even where an applicant is credible, corroboration may be required if the applicant is to meet her burden of proof. Id. at 554.[5]

The Real ID Act of 2005 provides that "[no] court shall reverse a determination made by the trier of fact with respect to the availability of corroborating evidence . . . unless the court

---

[5]A credible asylum claimant may fail to meet her burden of proof for reasons other than a lack of corroboration. See, e.g., Ahmed v. Ashcroft, 341 F.3d 214, 216 (3d Cir. 2003)(credible alien did not meet burden of proof for asylum because feared treatment did not amount to persecution).

finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." § 101(e), Pub. L. No. 109-13, 119 Stat. 231, 305, to be codified at 8 U.S.C. § 1252(b)(4)(D). This provision was effective on passage of the REAL ID Act, May 11, 2005, and applies to any case "in which the final administrative removal order is or was issued before, on, or after such date." Id. § 101(h)(3), 119 Stat. at 305-306. See Zheng, 417 F.3d at 383 n. 2. Thus, this standard of review applies in this case.

C.

Chen's only corroboration for her version of events was an unsworn letter from her father, who was still in China, stating that Chen had been seized by "village cadres" from her aunt's home and taken to the hospital where she was forced to undergo an abortion. (AR 125.) Not only was the father not subject to any cross examination, but much of his affidavit appears to be based solely on what his daughter (or others) told him.

To support her claim Chen relies heavily on a document which she referred to as an "abortion certificate." (AR 72.) She claimed that this document was issued by the hospital that performed the abortion. The record is unclear as to when the certificate was actually prepared or issued, even though it bears the date April 20, 2000. Chen did not testify that the certificate was given to her at the time of her abortion, and her testimony indicated that she was at the hospital for only 35-40 minutes. When asked by the IJ how she came into possession of the certificate, Chen stated that at the request of her father it had been brought to the United States by an unnamed cousin who was coming to this country as an immigrant. There was no

testimony as to how the cousin actually obtained the document.[6]

The IJ questioned whether this document was genuine, or, alternatively, whether it indicated that Chen voluntarily had an abortion. Relying on the Department of State's *China: Profile of Asylum Claims and Country Conditions* ("Country Report"),[7] dated April 14, 1998, the IJ concluded that this certificate was not adequate proof of a forced abortion. The Country Report notes that although official policy in China does not authorize physical force to coerce women to submit to an

---

[6]This abortion certificate was not authenticated in the manner set forth in 8 CFR § 287.6, and Petitioner appears to have made no effort to obtain such authentication. Although the IJ did not rely on the absence of such authentication or attempt to bar the certificate from evidence, it is clear that he questioned both its authenticity and meaning. Failure to comply with § 287.6 does not, in any case, result in a per se exclusion of documentary evidence, and a petitioner is permitted to prove authenticity in another manner. Liu v. Ashcroft, 372 F.3d 529, 533 (3d Cir. 2004). However, in this case there is not only a lack of direct evidence of the abortion certificate's authenticity, but a lack of evidence which might explain the circumstances or context of the issuance of that certificate.

[7]Reliance on Country Reports is permitted by 8 C.F.R. §§ 208.12 and 240.69. Rapidly changing conditions may on occasions render a country report's information inaccurate. See Berishaj v. Ashcroft, 378 F.3d 314, 329 (3d Cir. 2004). However, neither party in this case has offered proof of any such change.

unwanted abortion, this practice still occurs, particularly in certain areas of the country where population authorities are under pressure to meet population targets.[8] (AR 266.)

According to the Country Report, the United States Embassy in China is "unaware" of the practice of issuing abortion certificates.[9] Embassy officials are familiar with one type of document that is generally issued upon a patient's request after a voluntary abortion for the purpose of supporting a request for sick leave from work, a right provided by Chinese law. This conclusion is consistent with the common sense notion that government officials who force a woman to abort a child would hardly be likely to issue a certificate attesting to that fact, especially since the Country Report indicates that use of such force is not official government policy. Indeed, the existence of a hospital-issued abortion certificate might support a reasonable inference that the abortion attested to in the certificate was voluntary and not procured by government force. The abortion certificate, if believed to be genuine, might support

---

[8]Most Chinese asylum cases involving coercive family planning practices come from three provinces, including Fujian Province where Petitioner resided. The Country Report notes that it "is not aware of any forced abortions [in Fujian Province] . . . (but could not exclude the possibility)." (AR 269.)

[9]The Country Report notes that in southeast China, where Fujian Province is located, there is a major problem with false documents. When an American Consulate General asked Fujian officials to investigate "suspected fake documents," 66 of 109, "were determined to be incorrect or fake." (AR 279-280.)

the conclusion that Chen did undergo an abortion. However, that a young women in Chen's circumstances voluntarily chose to have an abortion would hardly be an unusual event in China given the government's strong push for population control and the personal predicament in which petitioner found herself, and thus it has no probative value in establishing that any such abortion was involuntary.

In an adversarial system of adjudication, it is typical that each side to the dispute has access to facts which might support its position or contradict the assertions of the other side. Notwithstanding the immense resources of the United States, asylum hearings which sometimes depend on narrow and specific factual findings often put the government at a substantial disadvantage. In a forced abortion case the Petitioner testifies to events which support her claim, events which have often taken place in a remote part of the world. The United States cannot, as a practical matter, send investigators to interview doctors, neighbors, or family members, inspect medical records, or use any other discovery techniques which would be routine in domestic litigation. In this context the need for corroboration is particularly important.

The IJ found that the only real corroboration for Petitioner's story was the father's affidavit and the abortion certificate, a document whose authenticity he questioned and a document which on its face is silent as to whether the abortion referred to was procured without consent. He identified a variety of factual areas where corroboration might have been provided and noted that the affidavit from her father demonstrated that there were lines of communication open with China. As noted earlier, the purported abortion certificate was brought to the United States by a cousin of Petitioner, who must

have been able to communicate with that cousin prior to her departure for the United States. There is nothing in the record to suggest that a "reasonable trier of fact" would be "compelled to conclude that corroborating evidence is unavailable." REAL ID Act, § 101(e), 119 Stat. at 305. Even using the pre-REAL ID Act standard for reviewing IJ determinations concerning the availability of corroboration, the IJ's finding that it was reasonable to expect more corroboration and that there was no satisfactory explanation for its absence was supported by substantial evidence in the record.

The BIA's rule on corroboration in In re S-M-J- involves a three step analysis: (1) an identification of facts for which it is reasonable to expect corroboration; (2) the presence or absence of such corroboration in the record; and (3) the adequacy of applicant's explanation for its absence. Abdulai, 239 F.3d at 554.

In his opinion the IJ identified many factual areas where corroboration might have been expected but was lacking, including: (i) the authenticity and meaning of the purported abortion certificate (there were no other hospital records confirming that Chen had undergone an abortion on April 20, 2000); (ii) the circumstances surrounding her residence in her aunt's home and her forced removal to the hospital (there was no affidavit from the aunt);[10] (iii) her leave of absence from work during the period following the doctor's determination that she was pregnant (there were do documents indicating either a request for leave or the grant of such a request); (iv) details concerning the young man who impregnated her, including an identity card, and some form of employment verification ("Give me documentation that this man exists" (AR 55.)); (v) documentation of her residency in the factory dormitory where

---

[10] Although not mentioned by the IJ, there is no indication in the record as to how the aunt's neighbors found out she was pregnant at such an early stage of the pregnancy.

her relationship with her boyfriend developed, particularly since her asylum application made no reference to her living in the dormitory; and (vi) medical records of the doctor who diagnosed her pregnancy.

The IJ properly found that there were lines of communication open between Chen and China, and there was no real attempt to explain the absence of corroboration. The IJ himself noted that he might understand the reluctance of a doctor to get involved in a situation where there was a forced abortion, but there is no indication that Chen or her family attempted to contact the doctor to see if he or she would make those records available. The three part analysis described in Abdulai was properly performed. He clearly identified facts for which it was reasonable to expect corroboration, he properly found that such corroboration was lacking, and he analyzed the lack of adequate explanations for Chen's failure to produce corroboration.

D.

In addition to finding inadequate corroboration of Petitioner's story, the IJ purported to find that her testimony lacked credibility. The internal consistency of a witness's testimony, its consistency with other testimony, its inherent (im)probability, as well as the witness's tone and demeanor are important factors in determining credibility, although excessive focus on insignificant testimonial inconsistencies to support a finding of lack of credibility may not be justified. See Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002). The Third Circuit has also recognized that an IJ is normally in the best position to make credibility determinations as he is "uniquely qualified to decide whether an alien's testimony has about it the ring of truth." Abdulrahman v. Ashcroft, 330 F.3d 587, 597 (3d Cir. 2003) (quoting Sarvia-Quintamilla v. INS, 767 F.2d 1387, 1395 (9th Cir. 1985).

It might seem intuitive that a lack of corroboration could cast doubt on the veracity of a witness's testimony, even a

witness whose story was delivered with an appealing demeanor, internally consistent, and not inherently improbable. Indeed, such a characterization might well describe the pitch of a flimflam man. However, it is clear that the BIA's own rule requires a credibility determination to be independent of an analysis of the sufficiency of an applicant's evidence. "A failure of proof is not a proper ground per se for an adverse credibility determination. The latter finding is more appropriately base upon inconsistent statements, contradictory evidence, and inherently improbable testimony." Abdulai, 239 F.3d at 551 n. 6 (quoting In re S-M-J- , 1997 WL 80984 *731).

While the IJ finds that Chen "deliberately lied in order to obtain asylum" (AR 56), a reading of the hearing transcript and his decision makes clear that this conclusion flows in substantial part from a failure of proof occasioned by a lack of corroboration. While there are some discrepancies in her testimony, it cannot be said that his credibility determination was based "only [on] an analysis of the internal consistency and plausibility of [Chen's] claim," Id. at 551 n.6, or from her demeanor or tone in testifying. Rather, the IJ repeatedly points to various areas where needed corroboration was lacking. Indeed, his conclusion that she was not credible is immediately preceded by a laundry list of areas where corroboration was lacking. (AR 55-56.) The IJ seems to have impermissibly blurred the line between the credibility of a claimant and the adequacy of proof to support the claim of asylum.

If we assume that the IJ did not make a valid credibility determination, it does not affect the result in this case. As noted earlier, even a credible asylum applicant may be required "to supply corroborating evidence in order to meet [her] burden of proof." Id. at 554. If the IJ's decision in this case is supported by substantial evidence in the record, then his failure to make a valid credibility determination would not bar this Court's denial of the petition for review without a remand. See Kayembe v. Ashcroft, 334 F.3d 231, 235 (3d Cir. 2003) ("If the BIA decision [denying asylum] can be found to be supported by

substantial evidence, even if [an alien's] testimony is credible, then the absence of a finding on credibility is not significant to the disposition of the case.").[11] As noted above, both the

---

[11]In Kayembe this Court reviewed a decision of the BIA which did not merely adopt the decision of the IJ who had denied the petition. The IJ found the applicant not credible, but this determination was reversed by the BIA which did not, however, do its own credibility analysis. Relying on Abdulai, the Court found that "[i]t is possible, however, that Kayembe's testimony alone, even if found to be credible, may not meet his burden of proof." Id. at 238. The BIA found inadequate corroboration, but failed to properly perform the three part analysis required by Abdulai. Thus, with neither a valid credibility determination nor a valid corroboration analysis, the matter was remanded to the BIA as its decision could not be meaningfully reviewed. Id. at 238-239.

In Miah v. Ashcroft, 346 F.3d 442 (3d Cir. 2003) the matter was also remanded due to the BIA's failure to conduct its own proper corroboration analysis. Here the BIA reversed the IJ's finding of non-credibility and specifically "found Miah to be credible." Id. at 440. The opinion contemplated that on remand the BIA would send the case back to the IJ for a determination of whether the IJ's perception of the need for corroboration would be influenced by the BIA's finding of credibility overruling the earlier IJ finding of non-credibility. Id. In Chen's case there was no administrative finding of credibility, since the BIA merely adopted the IJ's decision. Because the IJ's credibility determination was itself based primarily on a lack of corroboration, there is nothing to indicate that on remand the IJ would modify his perceived need for corroboration, even with the knowledge that his finding of non-credibility was legally erroneous.. This Court is not determining that Chen's testimony was credible, as the BIA did in Miah, but merely giving no weight to the IJ's credibility finding in

Country Report's conclusion that forced abortion is not governmental policy in China,[12] coupled with the almost total lack of corroboration of Chen's story, constitutes substantial evidence sufficient to deny the petition for review.

V.

We have reviewed the record with respect to Chen's claims under 8 U.S.C. § 1231(b)(3) and the Convention Against Torture, and find that there is an absence of substantial evidence to back either claim. Both of these claims are based on the allegation that if Chen is returned to China, she will be prosecuted and imprisoned for illegally exiting China in the first instance. Chinese law barring illegal emigration is generally applicable to all illegal emigrants who return to China, and there is nothing in the record to support a conclusion that either Chen would be singled out for particularly harsh punishment or the nature of the punishment would be severe enough to amount to persecution or torture. See Chang v. INS, 119 F.3d 1055, 1060-61 (3d Cir. 1997); Abedini v. INS, 971 F.2d 188, 191 (9th Cir. 1992).

VI.

Based on the foregoing, the Petition for Review of the decision of the IJ denying asylum under 8 U.S.C. § 1158 and denying withholding or removal under 8 § U.S.C. 1231(b)(3) and the Convention Against Torture is hereby denied.

---

reviewing the record to determine if the IJ's decision was supported by substantial evidence.

[12]Although the Country Report also states that coercive abortions may occur in some rural areas, "[j]ust because the State Department reports cuts both ways, however, does not mean that it does not constitute substantial evidence." Kayembe, 334 F.3d at 236.