

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-21-2006

# Ni v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-4574

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation
"Ni v. Atty Gen USA" (2006). *2006 Decisions*. Paper 48.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/48

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-4574

———

RONG YI NI,

Petitioner,

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

———

On Petition for Review of the Board of Immigration Appeals
(BIA No. A73 583 589)

———

Submitted Under Third Circuit LAR 34.1(a)
December 12, 2006

Before: SMITH, ROTH, *Circuit Judges*, and IRENAS,[*] *Senior District Judge.*

(Filed:  December 21, 2006)

———

OPINION

———

[*] Honorable Joseph E. Irenas, Senior United States District Judge for the District of New Jersey, sitting by designation.

IRENAS, *Senior United States District Judge.*

Petitioner, Rong Yi Ni, seeks review of the decision of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") decision that Petitioner was ineligible for asylum , withholding of removal and relief under the Convention Against Torture.[1]  For the following reasons, the Petition will be denied, except that it will be granted as to the finding of fraudulent filing.

I.

Petitioner is a woman presently in her late forties.  She is a native and citizen of the People's Republic of China.  She asserts that she left China on October 20, 1996, for fear of forced sterilization by the government after the birth of her second child.  She applied for political asylum in the United States in 1997.

Petitioner's interactions with family planning officials in China began in 1987. Officials came to Petitioner's home and informed her that because she already had a daughter, she must submit to having an intrauterine device ("IUD") inserted in her body to prevent her from having another child within the next four years.  Petitioner states she was taken to a hospital and an IUD was inserted.

In the year following the insertion, Petitioner attended two examinations to monitor the status of her IUD.  Petitioner asserts that the IUD caused pain in her

---

[1]  Petitioner did not challenge the denial of her application for relief under the Convention Against Torture before this Court. Accordingly, we deem the issue waived.  *Lie v. Ashcroft*, 396 F.3d 530, 532 n.1 (3d Cir. 2005).

abdomen, which led her to seek out a private doctor to remove the IUD. She explains that she avoided at least one subsequent IUD examination by staying at an unnamed uncle's house in Fuzhou, where family planning officials could not find her.

Petitioner learned that she was pregnant with her second child in February, 1989. Shortly thereafter, she went to live with her sister in Fenchen Town to avoid family planning officials. Petitioner reports that while she was away, family planning officials visited her home and spoke to her husband. The officials told her husband that Petitioner was required to submit to an IUD examination. The officials allegedly threatened her husband with sterilization if Petitioner failed to report for the examination and added that if she was pregnant, family planning officials would abort the pregnancy.

Petitioner gave birth on October 20, 1989, in her sister's home with the assistance of a midwife.[2] Petitioner says she avoided giving birth in a hospital for fear of the family planning officials. In that same month, just before giving birth and still purportedly hiding from Chinese officials, Petitioner returned to her native village to report to a government office to collect registration paperwork in connection with her marriage.[3]

A month after delivering the baby, Petitioner returned home, where, she reports, the family planning officials soon visited her. By this time, Petitioner's husband had

---

[2] At the asylum hearing, Petitioner did not indicate whether she gave birth to a son or daughter or the child's name.

[3] Petitioner testified at the removal hearing that she married her husband in 1982 but did not register the marriage until January, 1989.

already left China.[4]  The officials told Petitioner that she had violated the family planning policy and that consequently she was required to pay a fine and undergo sterilization. Petitioner testified that the officials "dragged" her out of her house because she refused to go to the hospital with them.

Petitioner further testified that she was taken to an operating room in Guntou Hospital where a doctor concluded that Petitioner could not safely undergo sterilization surgery because of her low blood pressure.  As an alternative, the doctor inserted an IUD.

On September 11, 1996, almost seven years after her husband's departure from China and the birth of her second child, Petitioner states she received[5] the following notice:

> You couple have got two children.  You should get sterilized at the
> county service office of birth control within ten days after you receive
> the notice.  You will accept disciplinary penalty if you delay.

(App., P.A. 2 at 57 (English translation)).  Petitioner stated that she left her home the same day to hide again at her sister's house.  Just over a month later, Petitioner left China.[6]  She testified that she believes she will be sterilized, fined, and imprisoned if she returns to China.  As discussed *infra,* almost all of Petitioner's testimony is

---

[4]    Petitioner testified that her husband left China one month before she gave birth to their second child.  Presently, Petitioner and her husband live together in the United States.  She stated that her husband's application for asylum was previously denied.

[5]  Petitioner testified that the notice, addressed to her and her husband, was delivered to her home when she was not there.  According to Petitioner, her father-in-law actually received the notice, who then informed Petitioner.

[6]  Petitioner's two children remain in China, living with her sister.

4

uncorroborated, there being no independent evidence in the record to support it.

## II.

This Court has jurisdiction to review the BIA's final removal order pursuant to 8 U.S.C. § 1252(a).  The BIA's three paragraph opinion did not summarily affirm the IJ's oral opinion but relied heavily on and adopted portions of the IJ's opinion.  Therefore, we review the BIA's opinion and also the IJ's opinion to the extent it was relied upon by the Board.  *Xie v. Ashcroft,* 359 F.3d 239, 242 (3d Cir. 2004).  Factual determinations about past persecution or fear of future persecution, as well as credibility determinations, are reviewed under the substantial evidence standard. *Chen v. Gonzales*, 434 F.3d 212, 216 (3d Cir. 2005).  Thus, factual findings must be upheld "unless any reasonable adjudicator would be compelled to conclude to the contrary."  *Id.* (citing 8 U.S.C. § 1252(b)(4)(B)).

Adverse credibility determinations should be based on "inconsistent statements, contradictory evidences and inherently improbable testimony," regarding matters going to "the heart of the asylum claim." *Chen,* 434 F.3d at 216.[7]

### A.

---

[7]  The REAL ID Act of 2005 changed the standard for credibility determinations.  *See* 8 U.S.C. § 1158(b)(1)(B)(iii).  However, the change was prospective, and does not apply to Petitioner's case, as her asylum application was filed in 1997.

In dismissing Petitioner's appeal, the BIA explained, "the Immigration Judge made a specific credibility finding supported by observations of the respondent's demeanor and problems within the respondent's testimony and between the testimony and the application for asylum." (App., P.A. 1 at 4). Specifically, the "important" inconsistencies the BIA and the IJ found "inadequately explained" were: (1) the fact that Petitioner submitted the sterilization notice to the Department of Homeland Security in connection with her asylum application but did not mention the notice during her asylum interview; (2) the asylum officer's "assessment / referral memo" (hereafter "referral memo") from the asylum interview indicated that Petitioner "'voluntarily'" (voluntarily in quotation marks in the memo) submitted to having an IUD inserted; (3) the asylum officer's summary recorded Petitioner's statement that she suffered "no harassment or intimidation" from the Chinese government from 1989 and 1996; (4) the fact that Petitioner swore to the asylum officer that her asylum application (Form I-589) was true and correct but later amended and supplemented her application by way of affidavit; and (5) Petitioner's testimony that she went to a government office to obtain her marriage certificate when she was nine months pregnant. The BIA concluded that these inconsistencies sufficiently discredited Petitioner's testimony that she had suffered past persecution or feared future persecution.[8] The BIA also held, without much explanation,

---

[8] Whether Petitioner's testimony, if believed and sufficiently corroborated, would establish persecution, is not an issue raised by this Petition. *See* 8 U.S.C. § 1101(a)(42) ("[A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion.").

that Petitioner's evidence was insufficient to support her asylum claim.

This case presents familiar issues of credibility and corroboration. As this Court has observed before, though "intuitively related . . . corroboration and credibility are distinct concepts that should be analyzed independently." *Obale v. Attorney General*, 453 F.3d 151, 163 (3d Cir. 2006). A separate analysis is necessary because "even a credible asylum applicant may be required to supply corroborating evidence in order to meet her burden of proof." *Chen*, 434 F.3d at 221. In many cases then, credibility is only half of the equation. Corroboration of even entirely credible testimony may often be required to meet an applicant's burden of proof. *Cf. id.* at 221-22 ("If we assume that the IJ did not make a valid [adverse] credibility determination, it does not affect the result in this case. . . . both the Country Report's conclusion that forced abortion is not government policy in China, coupled with the almost total lack of corroboration of Chen's story, constitutes substantial evidence sufficient to deny the petition for review.").

Indeed, in the immigration context, the fundamental inquiry should focus more clearly on corroboration, and less on credibility determinations.

> In an adversarial system of adjudication, it is typical that each side to the dispute has access to facts which might support its position or contradict the assertions of the other side. Notwithstanding the immense resources of the United States, asylum hearings, which sometimes depend on narrow and specific factual findings, often put the government at a substantial disadvantage. In a forced abortion case the Petitioner testifies to events which support her claim, events which have often taken place in a remote part of the world. The United States cannot, as a practical matter, send investigators to interview doctors, neighbors, or family members, inspect medical records, or use any other discovery techniques which would be

7

routine in domestic litigation.

*Chen,* 434 F.3d at 219.

Immigration hearings qualitatively differ from the typical American model of civil adjudication which is so heavily dependent on liberal pre-trial discovery of evidence. It is asking a great deal of an IJ, much less a reviewing appellate court, to make informed and reliable credibility determinations, particularly in light of cultural differences and language barriers which may compound the problem. It is for this reason that "the need for corroboration is particularly important." *Chen*, 434 F.3d at 219. Refocusing the analysis on when and what type of corroboration may be rightfully expected from an asylum applicant in order to satisfy her burden of proof avoids the inherent problems in relying almost exclusively on credibility determinations.[9]

With this understanding, we turn to the present Petition. The BIA's determinations with respect to both corroboration and credibility are supported by substantial evidence. (*See* App., P.A. 1 at 5) ("we agree with the Immigration Judge that the respondent's testimony is simply too inconsistent to be worthy of belief and the evidence insufficient to support her claim to relief."). The corroboration analysis requires: (1) an identification of

---

[9] The relatively recent changes to the immigration laws recognize that the crux of asylum decisions is corroboration, not credibility. With respect to sustaining an applicant's burden of proof in asylum cases, the INA instructs that "The testimony of the applicant may be sufficient without corroboration, *but only if* the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts." 8 U.S.C. § 1158(b)(1)(B)(ii) (emphasis added). Thus, pursuant to the statute, corroboration will normally be required and its absence can only be remedied by specific credible testimony. Further, the judicial review provisions of the INA provide that "No court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence, as described in section 1158(b)(1)(B) . . . unless the court finds . . . that a reasonable trier of fact would be compelled to conclude that such corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4).

facts for which it is reasonable to expect corroboration; (2) the presence or absence of such corroboration in the record; and (3) the adequacy of applicant's explanation for its absence. *Obale*, 453 F.3d at 163; *Chen*, 434 F.3d at 220 (citing *Abdulai v. Ashcroft*, 239 F.3d 542, 554 (3d Cir. 2001)).

The IJ's opinion explained that he required corroboration of Petitioner's assertion that it is China's policy to forcibly sterilize women with two children. Particularly in light of the fact that Chinese law prohibits involuntary sterilization and abortion, the IJ reasoned, Petitioner should be expected to put forth some other evidence, in addition to her own testimony, which would demonstrate that Chinese law "is not followed by the local government." (App., P.A. 1 at 14).

The Petitioner submitted an English translation of a purported sterilization notice. The original Chinese version of this document was not available to the IJ. Petitoner's counsel has advised this Court that the original was submitted in connection with Petitioner's husband's failed application. Neither the IJ nor the BIA considered the sterilization notice sufficient corroboration of Petitioner's assertion in this regard. This Court does not disagree with that determination. The notice was not authenticated in any manner. While *Liu v. Ashcroft* holds that not every asylum applicant must authenticate documents in the manner prescribed by 8 C.F.R. § 287.6, it is clear that some sort of authentication is required.[10] 372 F.3d 529, 533 (3d Cir. 2004) (explaining that §

---

[10] As noted in *Chen,* 434 F.3d at 219 n.9, Fujian Province (Petitioner's province) has "a major problem with false documents."

287.6 is not the "exclusive means" for proving a document's authenticity and stating that the applicant "should have been allowed to attempt to prove the authenticity of the abortion certificates through other means.").

Moreover, almost every factual assertion of Petitioner's testimony, including the fundamental assertion that she gave birth to two children,[11] is completely without corroboration, even though some amount of corroboration could have been easily presented. At the very least, it was reasonable to expect Petitioner to corroborate her own testimony with her husband's testimony. Yet, when the IJ questioned why her husband was not present to testify at the asylum hearing, Petitioner stated, "He's working today." (App., P.A. 2 at 37). After several more questions about Petitioner's explanation for her husband's absence, to which Petitioner gave no responsive answer, the IJ suggested that her husband did not come to the hearing because "he's not supposed to be present in the United States anymore. . . . He's evading law enforcement." (App., P.A. 2 at 38). Petitioner answered, "Yes, yes, yes, I've - - yes, I, I fear that, that he will be- - he would be sent to China and, and he would be sterilized and fined and imprisoned, and, and also his boss told him that he has to work . . . the boss wouldn't let him get take [sic] off . . . he asked." (App., P.A. 2 at 38).

Thus, Petitioner's explanation for the lack of corroboration was internally

---

[11] For example, there is no evidence in the record demonstrating that Petitioner communicates with her children (whose names she did not identify), or her sister in China, who purportedly is raising Petitioner's children.

10

inconsistent and improbable.[12]  Petitioner first explained that her husband was working.

Her second explanation was that he feared deportation and his boss told him he must

come to work.  Then she said that her husband asked for time off and was denied.  As the

IJ observed, not only are the statements inconsistent with each other,[13] it is improbable

that Petitioner's husband would choose going to work over testifying at the asylum

hearing.  (App., P.A. 2 at 37) (IJ: "what's more important, . . . going to work today, or

you getting asylum?").  Accordingly, we conclude that substantial evidence supports the

BIA's and IJ's decision that Petitioner's testimony was not sufficiently corroborated.

Likewise, substantial evidence supports the adverse credibility finding.  As stated

previously, adverse credibility determinations should be based on  "inconsistent

statements, contradictory evidences and inherently improbable testimony," regarding

matters going to "the heart of the asylum claim." *Chen,* 434 F.3d at 216.  At least two of

the five inconsistencies found by the IJ are substantial and go to the heart of Petitioner's

asylum claim.[14]  First, when Petitioner was interviewed by the asylum officer, she did not

make any mention of the sterilization notice which she now asserts was the immediate

---

[12]  Issues of corroboration and credibility sometimes intersect at this last step of the three-step corroboration analysis.  An applicant's explanation for the absence of corroboration can be inadequate if the explanation is found to be not credible.

[13]  One would not ask an employer for time off to attend the hearing if there was no intention to attend the hearing for fear of arrest and deportation.

[14]  Because we find the two inconsistencies discussed *infra* sufficient to support the BIA's decision, and in light of our independent conclusion regarding lack of corroboration, the Court expresses no opinion regarding the other inconsistencies relied upon by the BIA.

cause of her flight from China to the United States. While it is undisputed that Petitioner submitted the sterilization notice with her original application, Petitioner has put forth no adequate explanation for her failure to talk about the notice in her interview.

Petitioner asserts that the notice caused her to abruptly leave her home the very day on which she received it, never to return. In this context, it is both inconsistent and inherently improbable that Petitioner would completely fail to discuss the notice in her asylum interview (the whole purpose of which was to determine her reasons for fleeing her home country), if she did in fact receive such a notice and fear that she would be sterilized. Accordingly, the IJ reasoned, "[i]nasmuch as this would have been a very traumatic event in the respondent's life in China and formulate one of the foundation blocks of her application for asylum, [if true] it . . . doubtless would not have been omitted from her interview with the asylum officer in 1997." (App. P.A. 1 at 17). This conclusion is supported by substantial evidence.

Second, Petitioner stated in her asylum interview that she was not harassed or intimidated by the family planning officials for seven years after Petitioner claims she narrowly escaped sterilization in 1989. Then, inexplicably, in 1996, Petitioner states she received a notice of sterilization, even though she had not become pregnant in the intervening years and the government authorities knew her husband had left China over seven years prior. Such inconsistencies constitute substantial evidence supporting the IJ's and BIA's conclusions that Petitioner's testimony was not credible.

Because substantial evidence supports both the corroboration and credibility

12

findings, the Petition for review with respect to asylum will be denied.[15]

B.

Petitioner also requests that her Petition be granted on the ground that her due process rights were violated at the removal hearing and by the BIA's decision. Petitioner asserts that her due process rights were violated when the IJ admitted the asylum officer's memorandum report into evidence without the officer's own testimony and without admitting the officer's handwritten notes (taken during the asylum interview) from which the formal memorandum report was created.

"Because the Federal Rules of Evidence do not apply in asylum proceedings, the test for admissibility of evidence is whether the evidence is probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." *Ezeagwuna v. Ashcroft*, 325 F.3d 396, 405 (3d Cir. 2003). Petitioner asserts that *Ezeagwuna* supports the conclusion that her due process rights were violated. However, we find *Ezeagwuna* readily distinguishable.

This Court held that Ezeagwuna's due process rights were violated when the BIA heavily relied upon a letter drafted by a State Department official which forwarded results of an investigation by a Foreign Service post. *Ezeagwuna*, 325 F.3d at 403. We concluded that the letter lacked reliability and trustworthiness for several reasons,

---

[15] Accordingly, the Petition is also denied with respect to withholding of removal. *See Obale*, 453 F.3d at 161 ("An applicant who does not qualify for asylum necessarily does not qualify for withholding of removal.").

including that the letter contained "multiple hearsay of the most troubling kind;" the record contained no information about the investigator or investigation upon which the letter was based; and the letter was only produced to the applicant a few days before the final asylum hearing. *Id.* at 405-08.

This case, however, involves a routine memorandum report from an asylum officer interviewing the Petitioner. Thus, there is little basis to question its reliability and trustworthiness. The memorandum report does not contain the type of hearsay statements that were contained in the *Ezeagwuna* letter.[16] Nor is the source of the information contained in the report unknown. Therefore, it was fundamentally fair to admit the memorandum report.

Likewise, it was fundamentally fair both to exclude the asylum officer's handwritten notes, and to conduct the hearing without the testimony of the asylum officer. Neither omission raises serious questions about the reliability or trustworthiness of the fact finding process given that the report, which was drafted with the intention that it would be used at the asylum hearing, was admitted into evidence.

Petitioner also asserts that the BIA violated her due process rights by failing to remand the case to the IJ to consider the sterilization notice, when it appeared that the IJ may have overlooked it. "The fundamental requirement of due process is the opportunity

---

[16] Even under the Federal Rules of Evidence, the asylum officer's report would likely be a business record admissible under Fed. R. Evid. 803(6) ("Records of regularly conducted activity"). To the extent that the report itself contained statements of Petitioner, she was available to testify about those statements, and these statements might not even be defined as hearsay. Fed. R. Evid. 801(d)(1) and (2)(A).

to be heard at a meaningful time and in a meaningful manner.  In adjudicative contexts such as this one, due process requires three things. An alien: (1) is entitled to fact finding based on a record produced before the decision maker and disclosed to him or her; (2) must be allowed to make arguments on his or her own behalf; and (3) has the right to an individualized determination of his [or her] interests." *Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir. 2001) (internal citations and quotations omitted).

As the BIA noted in its opinion, the sterilization notice was part of the record before the IJ.  The evidence in support of her asylum claim was submitted, Petitioner was given ample opportunity at the asylum hearing to make arguments on her behalf, and an individualized determination of her interests was made.  Thus, Petitioner had a meaningful opportunity to be heard in the first instance and remand was not required.

Accordingly, the Petition will be denied as to the due process claims.


C.

Lastly, we do not agree with the IJ's and BIA's conclusion, based solely on the adverse credibility determination, that Petitioner's application was frivolous.  In *Muhanna v. Gonzales*, this Court explained that "frivolousness does not flow automatically from an adverse credibility determination . . . Inconsistencies between testimony and an asylum application, while certainly relevant to a credibility determination that may result in the denial of an applicant's asylum claim, do not equate to a frivolousness finding under Section 1158(d)(6), which carries with it much greater

consequences." 399 F.3d 582, 589 (3d Cir. 2005). A conclusion of frivolousness requires "a finding of deliberate fabrication of a 'material element' of an application, plus an opportunity for the alien to account for the inconsistencies." *Id.*; 8 C.F.R. § 208.20. No such finding was made in this case, and the record does not support such a conclusion. Accordingly, we will grant the Petition with regard to the frivolousness determination.

16