**GANG YONG CAI, Petitioner,**

v.

**UNITED STATES ATTORNEY GENERAL, Respondent.**

No. 06–3077.

United States Court of Appeals, Third Circuit.

Argued June 28, 2007.

Filed: Oct. 23, 2007.

Theodore N. Cox [Argued], New York, NY, for Petitioner.

Peter D. Keisler, Richard M. Evans, Nancy E. Friedman, Office of Immigration Litigation, U.S. Department of Justice, Washington, D.C., for Respondent.[1]

Before: BARRY, FUENTES, and GARTH, Circuit Judges.

1. Counsel for the government was scheduled to argue this case before the panel on June 28, 2007. However, because of a scheduling error, counsel was unable to attend. By letter faxed to the Court on the date of argument, the government consented to submit the matter on its written brief and acknowledged that it understood that petitioner would present oral argument as scheduled.

## OPINION

Garth, Circuit Judge:

Petitioner Gang Yong Cai seeks review of a final order of removal entered by the Board of Immigration Appeals ("BIA") on June 5, 2006. The BIA adopted and affirmed the decision of the Immigration Judge ("IJ") to deny petitioner's request for political asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). We have jurisdiction to review a final order of removal pursuant to 8 U.S.C. § 1252. We will deny the petition for review.

### I

Petitioner filed applications for asylum and withholding of removal, claiming past persecution in China on account of political opinion because the government forced his wife to have an abortion. He also applied for CAT protection. At a hearing before the IJ, he testified in support of these applications.

Petitioner testified that he was born on January 30, 1975, in Longfeng Village, Fujian, China. He stated that he married his wife, Bi Yun Zheng ("Zheng"), in a traditional ceremony on October 1, 1995. Petitioner claimed that he and Zheng then had a daughter, born on August 14, 1996. Petitioner did not register their marriage with the government until March 3, 1997.

Petitioner testified that, when he went to register their marriage on that date, Zheng was required to have a physical examination. The exam disclosed that Zheng already had a child and that she was one month pregnant. Petitioner testi-

fied that three people immediately took his wife to an operating room for an abortion. Zheng was also fitted for an IUD.

The marriage certificate was issued on March 4, 1997. A few days later, a village official fined the couple 10,000 RMB for "early birth and early marriage." (Administrative Record ("A.R.") 82.) Petitioner stated that he and his wife paid the fine in full on March 8, 1997. The couple was issued a receipt, but, as petitioner explained, the receipt used an incorrect Chinese character for one of the characters in petitioner's name.

Petitioner stated that when he and Zheng attempted to register their daughter into their Household Registration on May 13, 1999, the misspelling of his name on the receipt caused problems. The town issued a new receipt on June 2, 1999. (Ex. 14, A.R.219.) This receipt stated that "[in] November 1996, [Zheng] had IUD insertion, and was fined ten thousand Yuan for giving birth to *more than one child.*" *See* Ex. 14, A.R. 219 (emphasis added). Interestingly, it also stated that she had given birth to *no* male children and to *one* female child, and that her "first child" had been born in August 1996. (Ex. 14, A.R. 219.)

Even though petitioner was told that the March 1997 fine would be the last he would receive, petitioner and Zheng were again fined on January 11, 2000, this time 28,000 RMB. Petitioner testified that instead of crediting the 10,000 RMB he already paid, the government only credited him for paying 5,000 RMB, resulting in a new fine of 23,000 RMB.[2] (Ex. 23, A.R. 134.) According to the document, this fine was due because Zheng "gave birth to one girl on March 1996, which violated the

premature birth giving age." (Ex. 23, A.R.134.)

Petitioner stated that his aunt, who worked for the town family planning division, advised him to postpone paying this fine. On January 14, 2000, petitioner and his wife fled to Shangdong Province, where they stayed for a year, and then to Fuzhou City. Their daughter stayed with petitioner's parents. Petitioner testified that because they fled, Zheng was unable to attend her required periodic gynecological exams by the family planning division to ensure the IUD remained in place. Petitioner said that his aunt paid a doctor 200 RMB at the time of each missed exam so the doctor would sign the form indicating Zheng's IUD was in place and she was not pregnant. This form indicates that Zheng has a "[b]oy and 1 girl" and, in the place where the form asks for the "month and year of birth of [the] youngest child," the given answer is "August 1996." *See* Ex. 13, A.R. 224. It also states that the IUD was inserted in June 1997. (*See* Ex. 13, A.R. 224.)

On April 1, 2001, well after petitioner had fled, another fine notice was sent to petitioner's parents' house. This notice demanded that petitioner and his wife pay 28,000 RMB. The reason stated for the fine was that Zheng "gave birth to one girl on August 1996, which violated the premature birth giving age." (Ex. 15, A.R.217.)

Petitioner left China in September 2003, with the help of smugglers, and his wife left soon after he did. Petitioner arrived in the United States on October 20, 1993, but the smugglers took Zheng to Japan, where she remains. Petitioner stated that although it has been ten years since the birth of their daughter, and family planning officials sometimes give permission to

---

**2.** The document indicates that "23,000 Yuan" is "corrected from 28,000." See Ex. 14, A.R. 134.

rural residents to have a second child several years after their first, this permission was not a possibility in his case. As petitioner explained, he is classified as a rural resident but his wife is an urban resident, and urban residents cannot get permission to have a second child. *See* Ex. 14, A.R. 219 (showing that petitioner is classified as "Agricultural" and Zheng is classified as "Non–Agricultural").

On cross-examination, petitioner was questioned about why the June 2, 1999, receipt stated that Zheng's IUD was inserted in November 1996, if, as petitioner testified, the government did not know of Zheng's first pregnancy until March 1997. Petitioner answered that the document was written by officials and he did not know why they had written it that way.

The IJ rendered an oral decision denying petitioner's application for asylum, withholding of removal, and protection under the CAT. The IJ believed many parts of petitioner's story, but also found that petitioner "deliberately lied to this Court" about his wife having an abortion. (A.R.46.) The IJ stated that the "only documentation [supporting this claim] is from the respondent and his wife, the two most interested persons in this case." (A.R.47.) The IJ also remarked that no documentation regarding the abortion was offered from the family planning official, his aunt, or from anyone else, nor was any official document offered concerning the abortion. More importantly, the IJ stated that documents in the record directly contradicted petitioner's claim regarding the forced abortion. The IJ stated:

> I have a document that directly contradicts the respondent's story concerning whether or not there was an abortion. And that is Exhibit No. 14 [3] which was a document submitted not by the Govern-

ment, but by the respondent. The respondent's testimony is ... we were married in 1995. We had a child in 1996. We wanted to register that child in 1997, and as a result by our coming forward, it was learned that there was an abortion. Nobody even knew these people until they came forward in 1997. And yet the respondent submits a document in Chinese, Exhibit 14 that has been translated, that blows his story right out of the water. It states in 1996, she had an IUD insertion and was fined 10,000 rmb for giving birth to more than one child. That totally, directly contradicts his story. How I can believe that there was an abortion when I have this bomb shell, Exhibit No. 14? The basis of his claim for abortion is it happened in March of 1997. There was no IUD insertion until after March of 1997. And suddenly, we have this document that says that there was an IUD insertion in November, 1996. Now, that is a document submitted by respondent which directly contradicts his story. That raises the highest credibility issue.... [W]hen I have such a credibility issue which I do not believe there was an abortion. That is an untruth. And I will deny asylum based on that.

(A.R.47–49.) Consequently, the IJ also denied the petition for withholding of removal, and because the IJ found no evidence that people who flee the country without permission will be tortured on return, the IJ denied the CAT application as well.

The BIA "adopt[ed] and affirm[ed]" the IJ's decision, with a few additions. (A.R.2.) The BIA affirmed the IJ's adverse credibility finding, concluding that it was not clearly erroneous. (A.R.2); *see also* 8 C.F.R. § 1003.1(d)(3)(i). As support, the BIA noted "two major inconsistencies in Exhibit 14." (A.R.3.) First, the BIA point-

---

**3.**  Exhibit 14 is the June 2, 1999 receipt.

ed out that Exhibit 14 indicated that petitioner and his wife were fined 10,000 RMB in November 1996, at which point his wife also had an IUD inserted. By contrast, the BIA noted that petitioner testified that the IUD was not inserted until March 1997, and that the check-up certificate indicates that the IUD was not inserted until June 1997, yielding three different dates for this event, two of which differ from the date of the abortion.

Second, the BIA stated that petitioner testified that he and his wife have only one child, a daughter, born on August 14, 1996, and that his wife had been pregnant twice, with the second pregnancy ending in an abortion. By contrast, the BIA noted that Exhibit 14 indicates that petitioner and his wife were fined for "giving birth to more than one child" by November 1996, thus "indicating that the August 1996 birth was not the first one to occur." (A.R.2.) The BIA added that Exhibit 13[4] supported this conclusion because it indicates that the couple had a son and a daughter, the youngest born in August 1996. (A.R.2.) The BIA also observed that Exhibit 23[5] records the daughter's birth as having occurred in March 1996, rather than in August.

In addition to denying petitioner's asylum claim due to these "discrepancies in the record," the BIA also affirmed the denial of petitioner's application for withholding of removal and protection under the CAT.

This petition for review followed.

## II

To establish eligibility for a discretionary grant of asylum, an alien must be a refugee, that is, a person who is unable or unwilling to return to his country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). A person "who has been forced to abort a pregnancy or to undergo involuntary sterilization" qualifies as having been persecuted on account of political opinion, id., as does that person's spouse. See Chen v. Attorney General, 491 F.3d 100, 103 (3d Cir.2007); Matter of C–Y–Z, 21 I. & N. Dec. 915 (BIA 1997) (en banc).

It is the alien's burden to show he is a refugee. 8 C.F.R. § 208.13(a). He can sustain this burden either by proving past persecution, or by proving both an objectively reasonable and subjectively genuine fear of future persecution. See Chukwu v. Attorney General, 484 F.3d 185, 188 (3d Cir.2007).

An alien seeking withholding of removal must establish a "clear probability" that his life or freedom would be threatened on account of a protected ground if he were to be returned to the proposed country of removal. 8 C.F.R. § 208.16(b); Chen v. Gonzales, 434 F.3d 212, 216 (3d Cir.2005). This standard is stricter than the standard for asylum eligibility.

An applicant for CAT protection must show that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2).

## III

In cases where, as here, the BIA adopts and affirms the decision of the IJ yet also includes additional analysis of its own, we have jurisdiction to review both the decision of the IJ and that of the BIA. See

**4.** Exhibit 13 is the record of Zheng's IUD check-up examinations.

**5.** Exhibit 23 is an official document dated January 11, 2000 fine which imposed the fine of 23,000 RMB.

*Voci v. Gonzales,* 409 F.3d 607, 612 (3d Cir.2005). We review an adverse credibility determination for substantial evidence. *Gao v. Ashcroft,* 299 F.3d 266, 272 (3d Cir.2002). "We look at an adverse credibility determination to ensure that it was appropriately based on inconsistent statements, contradictory evidence, and inherently improbable testimony." *Toure v. Attorney General of U.S.,* 443 F.3d 310, 325 (3d Cir.2006) (citation omitted). Only if no reasonable factfinder could make an adverse credibility finding based on the record will we conclude that the adverse credibility determination was not supported by substantial evidence. *Dia v. Ashcroft,* 353 F.3d 228, 249 (3d Cir.2003).

## IV

The adverse credibility determination regarding petitioner's refugee status is supported by substantial evidence. As correctly noted by the IJ and the BIA, substantial inconsistencies exist between petitioner's testimony and the documents proffered to support his claim. The first discrepancy involved the date of the IUD insertion, which directly relates to the date of the alleged abortion. Petitioner testified that the authorities did not learn of his daughter's birth until his wife's physical examination on March 3, 2007. On that day, petitioner claims they performed a forcible abortion and inserted an IUD. The documents submitted by petitioner, though, tell a different story. As the BIA stated, Exhibit 14, which petitioner claims is a receipt for the payment of his first fine, states that Zheng had the IUD inserted in November 1996, several months before petitioner claims the authorities discovered the birth of his first child and his wife's second pregnancy. The document also states that the IUD was inserted after the birth of more than one child. Notably, Exhibit 13, which petitioner claims is a genuine record of Zheng's IUD check-ups, states that the IUD insertion occurred in June 1997, several months after petitioner claimed it occurred.

Discrepancies also exist concerning the date petitioner's daughter was born. As noted above, petitioner testified that his daughter was born in August 1996. Exhibit 23, which is the January 2000 fine notice, though, states that petitioner's daughter was born in March 1996. Therefore, this document conflicts with petitioner's testimony and all of the other documents in the case.

Another discrepancy is the number of children petitioner had. Petitioner testified that he had only one daughter, and that his wife's second pregnancy ended in abortion. However, as the BIA correctly stated, Exhibit 14 states that Zheng's IUD was inserted after the birth of *"more than one* child." Moreover, Exhibit 13 states that petitioner and his wife had *two* children, one boy and one girl, with the younger child born in August 1996.

These discrepancies cast doubt on petitioner's claim that his wife only had one child, that his second child was aborted, and that his wife had an IUD inserted after the birth of his first child. Petitioner's attempt to explain away these discrepancies is unavailing. He contends that the discrepancies are the product of "bureaucratic indifference to biographical details" and reflect poor record keeping by the relevant authorities. (Pet. Br. at 15.) Petitioner also contends that "no one commissioning false documents would have accepted such a ridiculous degree of inconsistency." (Pet. Br. at 16.)

While these contentions may be true, they do not lead to the conclusion that "no reasonable factfinder" could conclude that the IJ and BIA's adverse credibility determinations were not supported by substantial evidence. *Dia,* 353 F.3d at 249. The

substantial evidence standard requires that petitioner do more than simply offer a "plausible" alternative theory. *Chen v. INS,* 344 F.3d 272, 275 (2d Cir.2003). Based on the inconsistencies in the record, it is equally plausible that petitioner's wife had two children and then received an IUD and was not forced to undergo an abortion. Likewise, it was plausible that petitioner was not being truthful or proffered falsified documents. Either way, this is not our determination to make. Where the IJ and BIA make their decision and support it with substantial evidence, we will not disturb these determinations unless the alien demonstrates that the evidence presented "was so compelling that no reasonable fact finder could fail to find the requisite fear of prosecution." *INS v. Elias–Zacarias,* 502 U.S. 478, 481 n. 1, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

Finally, our doubts about petitioner's testimony is substantiated by the complete failure of his parents and aunt to even mention an abortion in their respective letters submitted by petitioner, even though this was seemingly the couple's primary reason for fleeing the country. (A.R.201, 204.)

Based on the foregoing, we hold that the IJ's and BIA's adverse credibility determinations were based on substantial evidence. Accordingly, petitioner's request for asylum was properly denied.

## V

Petitioner additionally seeks review of the IJ and BIA's decisions to deny his request for withholding of removal and relief under the CAT. Both requests will be denied. Because, as we hold today, petitioner failed to establish his eligibility for asylum under the lesser "well-founded fear" standard, it follows that he is unable to establish his eligibility for withholding of removal under the more stringent standard of "clear probability" of persecution. *See Janusiak v. INS,* 947 F.2d 46, 47 (3d Cir.1991). Furthermore, the evidence does not compel a finding that petitioner is "more likely than not" to be tortured upon his return to China. *See* 8 C.F.R. § 1208.16(c)(2). Accordingly, his petition to review the denial of withholding of removal and relief under CAT will be denied.

## VI

For the foregoing reasons, the petition for review will be denied.