

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-18-2007

# Mbube v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-1967

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Mbube v. Atty Gen USA" (2007). *2007 Decisions*. Paper 927.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/927

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 06-1967

EWANGE EPHRAIM MBUBE,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

On Petition for Review from an Order of the
Board of Immigration Appeals
(D.C. No. 0313-2: A98-273-266)

Submitted Pursuant to Third Circuit LAR 34.1(a)
June 4, 2007

BEFORE: SMITH and  COWEN,
and SILER*, Circuit  Judges

(Filed: June 18, 2007)

*Honorable Eugene E. Siler, Jr., Senior United States Circuit Judge, U.S. Court of
Appeals for the Sixth Circuit, sitting by designation.

## OPINION

COWEN, <u>Circuit Judge</u>.

Ewange Ephraim Mbube, a native and citizen of Cameroon, petitions for review of an order of the Board of Immigration Appeals ("BIA"), affirming an Immigration Judge's ("IJ") denial of his application for asylum and withholding of removal pursuant to the Immigration and Nationality Act ("INA") and protection under the Convention Against Torture ("CAT"). For the reasons stated below, we will deny his petition for review.

### I.

Mbube entered the United States on or about December 29, 2003, at Newark, New Jersey. On March 8, 2004, he filed an application for asylum and withholding of removal. Subsequently, the Department of Homeland Security issued a Notice to Appear charging him with failing to have a valid immigrant visa. At a merits hearing held on May 11, 2005, Mbube offered testimony and documentary evidence in support of his claim for relief. He testified that as a result of his membership and participation in a secessionist group known as the Southern Cameroons National Council ("SCNC"), government security forces in Cameroon arrested and beat him on four separate occasions, each of which is discussed below.

Mbube claimed that he was first arrested by police officers in early 2000, at a demonstration held to celebrate SCNC's declaration of independence. Mbube testified

2

that following his arrest, he was detained, interrogated about his involvement with SCNC, beaten with belts and sticks and kicked for approximately thirty minutes, and released the next day with the help of his family lawyer.

Mbube's second arrest allegedly occurred in October 2001, at a demonstration held to commemorate the fortieth anniversary of the independence of the Southern Cameroons. After the police officers arrested him, they took him to a cell, beat him, and when he asked them for something to drink, forced him to drink urine. Later that same day, police officers were in the process of transporting him and other prisoners to a nearby station when the vehicle capsized. Mbube testified that with the assistance of a local farmer, he was able to escape and return home.

Mbube's third arrest allegedly occurred at a polling station during the 2002 parliamentary and municipal elections. Mbube testified that, at the direction of SCNC officials, who instructed the younger SCNC members to disrupt the election process, he seized a ballot box from a poll worker and tore up ballots cast by citizens in the elections. Along with other SCNC members, Mbube was arrested at a polling place later that same day. Following his arrest, the police interrogated him about his knowledge of SCNC activities, and when he refused to answer, the police used a blade to make a small cut in the center of his chest. After this occurred about a dozen times, the police tied Mbube's feet, raised his legs above his head, and beat him on the back with heavy sticks and cables. The interrogation and beatings ceased after he divulged the whereabouts of the

3

SCNC chairman, and he was released seven days later.

The fourth arrest allegedly occurred at the funeral of Dr. Marin Luma, a SCNC chairman, on May 17, 2003. Along with other SCNC members, Mbube was allegedly arrested at the burial site for wearing a SCNC t-shirt. When he resisted being placed in a jail cell, he was struck in the back of the head with a rifle butt, causing a head wound that was left untreated for days. He was allegedly beaten on the soles of his feet for the remainder of his detention and, with the assistance of his attorney, released for medical treatment on May 22, 2003.

Mbube submitted numerous documents in support of his claim for relief. Those documents included: (1) his birth certificate; (2) a national identity card; (3) a SCNC membership card dated March 2003; (4) statements and affidavits from five individuals, including the Secretary General of the SCNC; (5) photographs of his injuries; and (6) a medical report indicating an injury and treatment date in August of 2003.

After hearing the evidence and arguments of counsel, the IJ denied Mbube's application for asylum, withholding of removal and protection under CAT, and ordered that he be removed to Cameroon. The IJ reasoned that based on several inconsistencies and discrepancies in the record, Mbube had not testified credibly about his alleged involvement in the SCNC or the alleged arrests and incidents of torture, and, furthermore, that he had failed to offer sufficient corroborating evidence. In addition, the IJ noted that the punishment which Mbube received following his third arrest in connection with his

4

actions in disrupting the election may have been in the nature of prosecutory conduct, not persecution. The Board affirmed the IJ's decision, and this petition for review ensued.

## II.

We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1). Where, as here, the BIA adopts the decision of the immigration judge but also discusses some of the bases for the decision, we have authority to review the decisions of both the immigration judge and the BIA. *Chen v. Ashcroft*, 376 F.3d 215, 222 (3d Cir. 2004). The administrative findings of fact are deemed conclusive "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1 (1992).

## III.

### A.

An adverse credibility finding must be supported by "specific, cogent reasons why the applicant is not credible." *Gabuniya v. Attorney General*, 463 F.3d 316, 321 (3d Cir. 2006) (internal quotation marks, brackets, and citation omitted). "We look at an adverse credibility determination to ensure that it was appropriately based on inconsistent statements, contradictory evidences, and inherently improbable testimony . . . in view of the background evidence on country conditions." *Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir. 2003) (internal quotation marks and citation omitted). Adverse credibility findings based on "speculation or conjecture, rather than on evidence in the record, are reversible."

5

*Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002). Furthermore, "only inconsistencies going to the heart of a claim will be deemed to compromise [an applicant's] credibility." *Chukwu v. Attorney General*, No. 05-4068, 2007 WL 1096890, at *4 (3d Cir. Apr. 13, 2007).[1]

After consideration of the record, we conclude that substantial evidence supports the IJ's adverse credibility determination. The IJ found a number of discrepancies between Mbube's testimony and his application, as well as between his testimony and the documents he submitted at the hearing. At least two of the discrepancies went to the heart of his claim. First, Mbube offered contradictory evidence concerning the nature of the beatings following his fourth arrest. He testified at the merits hearing that "one of the officers hit me with the butt of his rifle on [my] head," but in his affidavit in the record he wrote that "five healthy and strong military men held me up and were twisting my arms, some were beating me on the head with the tail of their riffles." The second discrepancy relates to his mother's arrest. Mbube wrote in his second affidavit in the record that "[his] mother was briefly arrested, after [his] departure from Cameroon, and told that the police would 'have to keep her for awhile' until [he] returned." At the merits hearing,

---

[1] Under the REAL ID Act of 2005, credibility determinations may be made "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." Pub. L. No. 109-13, § 101(a)(3)(B)(iii), 119 Stat. 231, 303 (2005). This provision of the REAL ID Act applies only to cases where the applicant applied for asylum or other relief after May 11, 2005. *See id*. § 101(h)(2), 119 Stat. at 305. Because Mbube applied for asylum in 2004, our pre-REAL ID Act standard applies.

6

however, he failed to make any mention of his mother's arrest, even when asked why he was afraid of returning to Cameroon. We agree with the IJ that Mbube's explanations for these inconsistences were unsatisfactory. In light of the discrepancies and the lack of adequate explanations, we conclude that the IJ's adverse credibility determination rested on substantial evidence.[2]

In addition to the foregoing discrepancies, the IJ found a number of other inconsistencies in the record. First, Mbube testified that he joined SCNC in January 2000 and received a membership card in April 2000, but the membership card he submitted was dated March 2003. He explained that he lost his first membership card in 2001, and did not receive the replacement card until two years later. Second, Mbube testified that he received medical treatment for injuries he sustained in May 2003, but a medical report in the record listed an injury and treatment date of August 2003. He explained that the date on the medical report was incorrect, and merely reflected the date his attorney sought the report. Third, Mbube testified that he was in hiding prior to his departure for the United States, but his application indicated that he was self-employed as an electrician until December 2003. He explained that he continued to identify himself as an electrician during his time of hiding, although he was not working at that particular time. Fourth, Mbube testified that he did not leave Cameroon until December 2003, but a number of the

---

[2] Because substantial evidence supports the IJ's adverse credibility determination, we need not consider Mbube's claim that the IJ erred in determining that Mbube sustained punishment as a result of prosecution for crimes he committed, not persecution.

affidavits in the record indicated that he had left before August 2003. He attributed the mistakes to his lawyer in Cameroon, who assisted in the preparation of the documents. Since we conclude that substantial evidence otherwise supports the adverse credibility determination, we need not consider whether these inconsistencies go to the heart of his claim or the reasonableness of Mbube's explanations for the inconsistencies.

Mbube's contentions concerning the IJ's evinced doubts about his identity and his refusal to consider unauthenticated documents are unavailing. It is true that "[m]ere doubts about the plausibility of a petitioner's testimony are an insufficient basis for denial of an application." *Toure v. Attorney General*, 443 F.3d 310, 326 (3d Cir. 2006). As we stated in *Toure*, "[i]f the BIA denies an asylum application solely because it finds the applicant not credible, it generally must clearly and explicitly state that it has made an adverse credibility finding and that it bases its denial on that finding." *Id*. Here, however, the record makes abundantly clear that the IJ did not deny Mbube's asylum application based upon mere doubts about his identity or adverse inferences drawn from his fictitious passport. Rather, there were inconsistencies in the record going to the heart of Mbube's claim which compromised his credibility as a whole.

Mbube also argues that the IJ disregarded unauthenticated documents in the record, such as his SCNC membership card, in reaching a conclusion on the issue of credibility. We recognized in *Liu v. Ashcroft*, 372 F.3d 529, 533 (3d Cir. 2004), that "8 C.F.R. § 287.6 is not an absolute rule of exclusion, and is not the only means of

8

authenticating records before an immigration judge." Thus, under *Liu*, an IJ commits error if he refuses to consider documents solely because they have not been certified in accordance with 8 C.F.R. § 287.6. *Liu* is inapposite here. While the IJ in this case noted that Mbube attempted to secure authenticated documents but was unable to do so, there is no evidence that the IJ refused to consider documents because they were not authenticated. Rather, the record shows that the IJ considered the unauthenticated documents, but found that they contradicted Mbube's testimony or were otherwise unpersuasive. In any event, the unauthenticated documents do not cure the material discrepancies in the record, which provide substantial support for the IJ's adverse credibility determination. *Cf. Liu*, 372 F.3d at 534 (remanding to the BIA where the improper rejection of unauthenticated documents could have infected the adverse credibility determination).

B.

Mbube argues that the IJ erred in requiring evidence corroborating that Mbube was a member of the SCNC who suffered persecution in Cameroon. We find no error in the IJ's request for corroboration. The BIA has adopted rules which require corroboration in instances where it is reasonable to expect such proof from a witness and there is no satisfactory explanation for its absence. *Obale v. Attorney General*, 453 F.3d 151, 163 (3d Cir. 2006). These rules, which we approved in *Abdulai v. Ashcroft*, 239 F.3d 542 (3d Cir. 2001), involve a three step analysis: (1) an identification of facts for which it is

9

reasonable to expect corroboration; (2) the presence or absence of such corroboration in the record; and (3) the adequacy of applicant's explanation for its absence. The third prong presumes that the IJ offers a petitioner an opportunity to explain the absence. *Obale,* 453 F.3d at 163.

Here, the IJ expressed doubts about whether Mbube was a member of the SCNC who suffered persecution in Cameroon and noted that the documents in the record attesting to his membership and persecution were of questionable value because they contradicted his testimony. When the IJ inquired why Mbube had not submitted direct testimony or affidavits from officials of a SCNC organization located in Maryland, Mbube could not provide an adequate explanation. Given the inconsistencies between the affidavits in the record and Mbube's own testimony, we find that it was reasonable for the IJ to request testimony or affidavits from additional SCNC members and, furthermore, that it was entirely appropriate to refer to the availability of officials from a SCNC organization located in a nearby state.

In summary, we conclude that the IJ engaged in a proper three-step corroboration analysis, and we are not "compelled to conclude that such corroborating evidence is unavailable." REAL ID Act of 2005, Pub. L. No. 109-13, § 101(e), 119 Stat. 231, 305 (2005).[3]

---

[3] This provision of the REAL ID Act of 2005 became effective immediately, and thus applies to Mbube's petition. § 101(h)(3), 119 Stat. at 305.

10

C.

To qualify for protection under CAT, an applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). An applicant must establish by objective evidence that he is likely to be tortured in the future. *Zubeda v. Ashcroft*, 333 F.3d 463, 469 (3d Cir. 2003). Torture is defined, in relevant part, as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." 8 C.F.R. § 208.18(a)(1). Claims for relief under CAT are "analytically separate" from claims for asylum and withholding of removal under the INA. *Zubeda*, 333 F.3d at 476. Consequently, rejection of asylum and withholding of removal claims does not control the analysis of a CAT claim. *Id*.

Mbube argues that the BIA and IJ erred in failing to conduct a separate analysis under CAT. We cannot agree. Here, as in *Toussaint v. Attorney General*, 455 F.3d 409, 417 (3d Cir. 2006), we are satisfied that the BIA conducted a separate inquiry for Mbube's claim under CAT. The BIA stated in its order that Mbube's "failure to establish even prima facie eligibility for such protection leads us to conclude that, even if the Immigration Judge failed to separately analyze his CAT claim, there is no basis for a remand of the record." Thus, it is clear that the BIA understood that claims under the INA and claims for CAT protection are separate forms of relief and afforded them individualized consideration. *Id*. Moreover, even though the Cameroon government's

11

human rights record is poor, we cannot conclude that a reasonable trier of fact would be compelled to conclude that it is more likely than not that Mbube would be tortured if removed to Cameroon.

For the foregoing reasons, the petition for review is **DENIED**.